17 A.3d 873

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**James Melvin SMITH, Appellant.**

Supreme Court of Pennsylvania.

Submitted July 1, 2010.

Decided March 29, 2011.

612

Cristi A. Charpentier, Billy Horatio Nolas, Defender Association of Philadelphia, Michael Wiseman, Philadelphia, for James Melvin Smith.

Hugh J. Burns, Philadelphia District Attorney's Office, Philadelphia, Amy Zapp, PA Office of the Attorney General, Harrisburg, for the Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice BAER.

James Melvin Smith (Appellant) appeals from an order denying his petition for relief pursuant to the Post Conviction

Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546. For the reasons stated herein, we affirm the order of the PCRA court denying the petition for PCRA relief.

As we explained on direct appeal, *Commonwealth v. Smith*, 518 Pa. 15, 540 A.2d 246 (1988), on June 22, 1979, Appellant, Levi Rucker (Rucker), and Kimberleigh Green (Green) met at Green's residence to plan the murder of Davis Kelly (Kelly). Kelly was suspected by these conspirators of having killed Michael Green, Green's brother, several months earlier. *Id.* at 248. In accordance with their plan, on the evening of June 22, 1979, Green, who was underage, asked Kelly to buy her some beer at the corner bar. Kelly agreed and entered the bar to purchase the beer. As he exited the bar to return to Green, Rucker closed the door so the patrons inside could not see what was about to transpire. Appellant then emerged from an adjacent alley and shot Kelly from behind. As Kelly attempted to stand, Appellant shot him three more times from approximately three feet away. The incident was witnessed by Betty Harris (Harris), a bystander who was sitting nearby on her front porch.

Two days later, Appellant was arrested for illegally carrying a .32 caliber pistol. A ballistics examination established that the bullets that killed Kelly were fired from this gun. Appellant denied involvement in the shooting, and was not charged with murder at that time. He was ultimately acquitted of the gun possession charges. Several years later, Green confessed her role in the murder and implicated Appellant. Appellant was arrested for the murder of Kelly on May 3, 1983.

Harris, who witnessed the shooting, gave several statements to police shortly after the murder.[1] She initially stated that she was unable to identify the shooter, and provided consistent statements to this effect on June 23, 1979, June 24, 1979, July 7, 1979, and December 11, 1979. Then, on October 21, 1982, Harris made a statement to police in which she identified Rucker as the shooter, explaining that she saw the shooter at the movies with a friend well after Kelly's murder, and the

1. Harris was related by marriage to Green.

friend identified him as Rucker. Two weeks before Appellant's trial, Harris provided a final statement to police, identifying Appellant as the shooter.

At Appellant's jury trial, the Commonwealth introduced the testimony of Green and Rucker, who each pled guilty to third-degree murder and conspiracy in exchange for their testimony against Appellant. Additionally, the Commonwealth introduced the testimony of Harris, Appellant's sister, Barbara Smith, as well as various police, ballistics, and forensic witnesses. Harris, who had claimed an inability to identify the shooter when police were investigating the murder, and then identified Rucker, testified that she saw Appellant shoot Kelly. She further testified that she was initially unwilling to identify Appellant as the shooter because she was afraid of him, but, on the eve of trial, she overcame this fear and gave a statement identifying him. Trial counsel attempted to discredit Harris's testimony with her prior inconsistent statements, arguing that Green and Rucker were the sole perpetrators.

On February 6, 1985, Appellant was convicted of murder in the first degree, criminal conspiracy, and possession of an instrument of a crime. Following a penalty hearing, the jury found two aggravating circumstances and no mitigating circumstances, and returned a sentence of death. After post-sentence motions were denied, the trial court formally sentenced Appellant to death on May 6, 1986. The trial court further imposed additional concurrent terms of five to ten years of imprisonment for criminal conspiracy and two-and-one-half to five years of imprisonment for possessing an instrument of a crime.

Appellant was represented by trial counsel on direct appeal. While the direct appeal was pending before this Court, Appellant filed a *pro se* "Motion for Withdrawal of Counsel Inter Alia Ineffective Assistance of Counsel," which this Court treated as an application for appointment of new counsel to represent Appellant in further proceedings under the Post Conviction Hearing Act (PCHA). We affirmed the conviction and sentence and remanded Appellant's case to the court of

common pleas for the appointment of new counsel for PCHA proceedings.

On remand, the court of common pleas appointed Attorney Jeremy Gelb (Gelb) on October 7, 1988, to represent Appellant during the PCHA proceedings. Over the next several years, Gelb continued those proceedings nineteen times and did not file any documents with the court. Accordingly, on September 30, 1991, the trial court dismissed the PCHA action without prejudice due to Gelb's lack of prosecution of the case.

On June 10, 1992, Appellant filed a *pro se* petition under the PCRA. On August 20, 1992, Attorney Richard Hoy (Hoy) was appointed to represent Appellant, and, on June 29, 1993, he filed an amended petition on Appellant's behalf raising two issues. On June 29, 1994, the PCRA court directed Hoy to file a statement setting forth the witnesses who would testify at an evidentiary hearing and the substance of their testimony. The court reentered this order following a defense motion for continuance. Following receipt of the witness list, the PCRA court scheduled an evidentiary hearing for March 1, 1995. On the day set for the hearing, Hoy neither appeared nor filed anything with the court. The Court continued the evidentiary hearing, and again directed Hoy to file a witness list.

On May 22, 1995, the Defender Association of Philadelphia replaced Hoy as Appellant's attorney. New counsel filed an amended PCRA petition on June 20, 1995, and another on August 28, 1998. The PCRA case was then transferred to a new PCRA court, which found every claim waived and dismissed all of Appellant's claims without a hearing. Appellant appealed the dismissal of his PCRA petition, resulting in this Court entering a *per curiam* order vacating the PCRA court's order and remanding "for an evidentiary hearing with respect to all disputed, material facts, and appropriate fact-finding." *Commonwealth v. Smith,* 577 Pa. 251, 844 A.2d 549 (2004). On April 30, 2004, we denied Appellant's application for reargument and the Commonwealth's request to clarify our remand order.

On June 29, 2004, when the case was again before the PCRA court, Appellant amended his PCRA petition to raise a claim that his execution would violate the Eighth Amendment because he is mentally retarded. *See Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). On February 27, 2009, Appellant's case was transferred to yet another judge for PCRA proceedings. The new PCRA court reviewed all of Appellant's claims, and, on May 8, 2009, granted an evidentiary hearing on three claims: whether *Atkins* barred Appellant's execution; whether Appellant had been forcibly medicated at the time of trial; and whether trial counsel was ineffective during the penalty phase with regard to the presentation of mitigating evidence. The court determined that Appellant's remaining claims did not involve contested facts and therefore could be decided without a hearing.

On June 19, 2009, defense counsel and the Commonwealth stipulated that Appellant would be granted a new penalty phase hearing based on the ineffectiveness of trial counsel, and the PCRA court ratified this stipulation. Appellant subsequently withdrew the claim that he had been forcibly medicated at trial and the PCRA court held that the *Atkins* claim was not ripe because of the new penalty phase hearing. This disposed of the three claims on which the PCRA court had granted a hearing. Remaining after this order were Appellant's claims that the PCRA court did not believe warranted a hearing. In due course, the PCRA court dismissed all of these remaining guilt phase claims without an evidentiary hearing. Appellant has appealed from the dismissal of these guilt phase claims. Thus, despite the length of time since Appellant's trial, and despite Appellant's prior appeal to this Court from the denial of his PCRA petition in 2004, the present appeal is his first appeal during which he has been able to argue the merits of the trial court's denial of his prayer for collateral relief.

■ Appellant raises eleven issues and numerous sub-issues for our review. Initially, we have jurisdiction over Appellant's petition because we directly review the denial of post-conviction relief in death penalty cases pursuant to 42 Pa.C.S.

§ 9546(d). In PCRA appeals, the scope of review is limited by the Act. 42 Pa.C.S. §§ 9541 *et seq.* Our standard of review is whether the findings of the PCRA court are supported by the record and are free of legal error. *Commonwealth v. Strong,* 563 Pa. 455, 761 A.2d 1167, 1170 n. 3 (2000).

This PCRA petition was initially filed prior to the effective date of the November 1995 amendments to the PCRA. Accordingly, the petition and appeal are governed by the previous version of the PCRA. *See Commonwealth v. Jones,* 583 Pa. 130, 876 A.2d 380, 383–84 (2005); *Commonwealth v. Bond,* 572 Pa. 588, 819 A.2d 33, 37 (2002). In order to be eligible for relief, a PCRA petitioner must establish by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated defects found in 42 Pa.C.S. § 9543(a)(2) (1995).[2] As to each claim, a petitioner must further establish by a preponderance of the evidence that the allegation of error has not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(3). A claim is previously litigated if "it has been raised in the trial court, the trial court has ruled on

**2.** This subsection provided as follows:

(2) That the conviction or sentence resulted from one or more of the following:

(i) A violation of the Constitution of Pennsylvania or laws of this Commonwealth or the Constitution of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(ii) Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(iii) A plea of guilty unlawfully induced where the circumstances make it likely that the inducement caused an individual to plead guilty.

(iv) The improper obstruction by Commonwealth officials of the petitioner's right of appeal where a meritorious appealable issue existed and was properly preserved in the trial court.

(v) A violation of the provisions of the Constitution, law or treaties of the United States which would require the granting of Federal habeas corpus relief to a State prisoner.

(vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

(vii) The imposition of a sentence greater than the lawful maximum.

(viii) A proceeding in a tribunal without jurisdiction.

the merits of the issue and the petitioner did not appeal," *see* 42 Pa.C.S. § 9544(a)(1), or "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue...." *Id.*, § 9544(a)(2). An allegation is waived "if the petitioner could have raised it but failed to do so before trial, at trial, on appeal or in a prior state post-conviction proceeding." 42 Pa.C.S. § 9544(b). Pursuant to *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693 (1998), the relaxed waiver rule is no longer applicable to PCRA appeals, and, therefore, any claims that have been waived by Appellant are beyond the power of this Court to review. *Jones*, 876 A.2d at 384.

Several of Appellant's claims involve counsel ineffectiveness. A PCRA petitioner will be granted relief on this ground only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). Generally, counsel's performance is presumed to be constitutionally adequate, and counsel will only be deemed ineffective upon a sufficient showing by the petitioner. *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 532 (2009); *Commonwealth v. Dennis*, 597 Pa. 159, 950 A.2d 945, 954 (2008). To obtain relief, a PCRA petitioner must demonstrate that counsel's performance was deficient and that the deficiency prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A petitioner establishes prejudice when he demonstrates "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. Applying the *Strickland* performance and prejudice test, this Court has noted that a properly pled claim of ineffectiveness posits that: (1) the underlying legal issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice befell the petitioner from counsel's act or omission. *Johnson*, 966 A.2d

at 533; *Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 12 (2008) (citing *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975 (1987) (adopting U.S. Supreme Court's holding in *Strickland* )).

Before addressing Appellant's issues, we acknowledge that this case presents the all too common problem of an inadequate PCRA court opinion. Although we previously remanded to the PCRA court "for an evidentiary hearing with respect to all disputed, material facts, and appropriate fact-finding," *Smith*, 844 A.2d 549, the PCRA court did not hold a hearing, apparently finding that there were no disputed, material facts with regard to these guilt phase issues.[3] Instead, the PCRA court dismissed Appellant's numerous issues and sub-issues in a 17 page opinion. In several instances, however, it appears that the PCRA court ignored entirely certain claims.

To enable appellate review, PCRA courts are required to provide "a legally robust discussion, complete with clear findings of fact where required." *Commonwealth v. Dennis*, 597 Pa. 159, 950 A.2d 945, 957 (2008); *see also Commonwealth v. Craig Williams*, 566 Pa. 553, 782 A.2d 517, 522–23 (2001); *Commonwealth v. Roy Williams*, 557 Pa. 207, 732 A.2d 1167, 1181 (1999) (remanding and directing the PCRA court to render "findings of fact and conclusions of law" in support of its disposition of issues turning on credibility). A fact-finding court should support its holding with sufficient explanations of the facts and law to facilitate appellate review. *Commonwealth v. Weiss*, 604 Pa. 573, 986 A.2d 808, 816 n. 4 (2009) (remanding where the PCRA court failed to address the "salient inquiry"); *Commonwealth v. Beasley*, 600 Pa. 458, 967 A.2d 376, 391 (2009) (remanding to permit the PCRA court to prepare an opinion addressing all claims raised in the amended post-conviction petition, and expressly resolve areas of material, factual controversy and material credibility disputes

---

**3.** Pennsylvania Rule of Criminal Procedure 909(B) requires a court to hold an evidentiary hearing on all genuine issues of material fact raised in a capital PCRA petition. The PCRA court's decision not to hold a hearing will only be reversed when the court abused its discretion. *Commonwealth v. Steele*, 599 Pa. 341, 961 A.2d 786, 819 n. 24 (2008); *Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564, 579 (2005).

via numbered factual findings); *Commonwealth v. Peoples,* 599 Pa. 254, 961 A.2d 109, 110 (2008) (remanding and directing the PCRA court to address all properly presented claims). Where a petitioner has presented a claim to the PCRA court and that court has not addressed it, a remand is appropriate where the claim cannot be resolved on the record. Where, however, we may resolve the claim on the record, we will proceed to decide it. *See Commonwealth v. Ali,* J–192–2008, Slip Op. at 32 n. 16 (pending) (addressing a claim resolvable on the record where the PCRA court did not address it). A thorough review of Appellant's issues reveals that they can be resolved on the record, even in those instances where the PCRA court did not consider them.

Because the Commonwealth and Appellant have stipulated that Appellant will be given a new penalty phase, all of Appellant's issues concern the guilt phase and will be addressed in turn.

## I. Actual Innocence

Turning to the first issue, Appellant claims that he is actually innocent and that relief is appropriate because of three assertions of after-discovered evidence. *See* 42 Pa.C.S. § 9543(a)(2)(vi) (providing that a petitioner may be eligible for relief if he pleads and proves that his conviction or sentence resulted from "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced."). The specific pieces of evidence Appellant offers are: notes of a conversation between trial counsel and Appellant's sister, Barbara; a declaration from Commonwealth witness Harris recanting her trial testimony and explaining that her in-court identification of Appellant was the product of police coercion; and unspecified evidence from Appellant's prior trial and acquittal on gun possession charges.

### A. Barbara

As factual background for this sub-issue, Appellant's sister, Barbara, testified for the defense at trial that Green told her that Rucker was the shooter, but that she (Barbara) had no

personal knowledge of the shooting. According to Appellant, after trial, Barbara changed her story. On the day of sentencing, she told defense counsel that she participated with Green and Rucker in planning the murder of Kelly, she was actually present at the shooting and witnessed Rucker shoot Kelly, Appellant was not present at the shooting or involved in planning it, and she did not want her brother's execution on her conscience. Trial counsel immediately memorialized this conversation in a typewritten memorandum. Trial counsel then moved for a new trial, characterizing Barbara's conversation as after-discovered evidence. In support of this motion, trial counsel sought to have Barbara testify about the substance of her conversation with counsel, but she invoked her Fifth Amendment right and refused. Trial counsel requested from the trial court permission to withdraw as counsel so that he could testify about the substance of his conversation with Barbara, but the trial court denied this request, and denied the post-verdict motion for a new trial.

On direct appeal, Appellant raised a claim of trial court error for denying the motion for a new trial based on the alleged after-discovered evidence of Barbara's conversation with trial counsel. We rejected this claim. We acknowledged that after-discovered evidence may provide a basis for a new trial under certain circumstances if the proposed new evidence is producible and admissible. *Smith*, 540 A.2d at 262–62 (citing *Commonwealth v. Scott*, 503 Pa. 624, 470 A.2d 91, 93 (1983)). We concluded, however, that whatever Barbara told counsel, she had refused to tell the court anything, and, consequently, Appellant had failed to show that her alleged exculpatory statements were "producible or admissible." *Id.* Appellant now makes two arguments to this Court in regard to Barbara's conversation with counsel.

### 1. After-discovered evidence

First, Appellant argues that Barbara's recantation to trial counsel is after-discovered evidence that he is actually innocent. Although Appellant acknowledges that on direct appeal this Court reviewed and rejected his argument that

Barbara's recantation was after-discovered evidence, he now asserts that this Court substantively erred on the merits by holding that the statement was not "producible or admissible." The Commonwealth argues that this claim is previously litigated. The PCRA court agreed with the Commonwealth and held that Appellant's after-discovered evidence claim was previously litigated and therefore unreviewable. *See* 42 Pa.C.S. § 9543(a)(3). Addressing the merits anyway, the PCRA court concluded that Barbara's conversation with counsel was not truly after-discovered evidence because it was cumulative of her trial testimony that Rucker was the shooter, and would not have compelled a different outcome at trial.

As Appellant acknowledges, we considered on direct appeal his argument that Barbara's recantation was after-discovered evidence. Appellant's dissatisfaction with this Court's ruling does not affect the conclusion that the after-discovered evidence claim was previously litigated and, therefore, is not presently cognizable under the PCRA. 42 Pa.C.S. § 9543(a)(3).

## 2. Trial court error

Second, Appellant argues that the trial court erred when it denied counsel's motion to withdraw to permit counsel to testify about his conversation with Barbara. The Commonwealth argues that this claim is waived. The PCRA court did not address this claim.

Appellant did not appeal the trial court's denial of counsel's motion to withdraw and, therefore, may not now raise this waived claim. *See* 42 Pa.C.S. § 9544(b).[4] Although Appellant asserts that he did, in fact, raise this claim on direct appeal

4. Appellant attempts to overcome waiver by relying on the pertinent version of the PCRA, which explains that to be eligible for relief a petitioner must plead and prove that an allegation of error that has been waived "has resulted in the conviction or affirmance of sentence of an innocent individual." 42 Pa.C.S. § 9543(a)(3)(ii). We decline to exempt Appellant from our finding of waiver because he has not demonstrated that the trial court's denial of the motion to withdraw has resulted in his conviction despite his actual innocence.

and this Court inexplicably ignored it, he offers no support for this bald assertion.[5]

## B. Harris

Appellant next asserts that a post-trial affidavit from Harris entitles him to relief. Before trial, Harris made several statements to police initially claiming that she did not know who the shooter was, and then, in 1982, she identified Rucker as the shooter. Several years later, two weeks before Appellant's trial, Harris identified Appellant as the shooter. She testified at trial that she witnessed Appellant shoot Kelly and that she had not identified him earlier because she was afraid of him. Counsel cross-examined her with regard to her relationship with Green, her prior inability to identify the shooter, and her prior identification of Rucker, attempting to convince the jury that Harris was unreliable and not credible.

Appellant provided the PCRA court with an affidavit from Harris in which she recanted her trial testimony. She explained that in 1982, she learned that Rucker was the name of the man she saw shoot Kelly; she repeatedly identified the shooter to police as Rucker, but the police insisted it was Appellant; police pressured her into identifying Appellant; and Appellant's trial counsel never spoke to her about the murder before trial, but if he had, she would have been truthful with him. Appellant argues that Harris's affidavit is after-discovered evidence, evidence of a *Brady* violation by the Commonwealth,[6] and is the basis of an ineffectiveness claim premised on counsel's failure to interview Harris before trial.

### 1. After-discovered evidence

■ Appellant asserts that Harris's affidavit is after-discovered evidence that entitles him to relief. *See* 42 Pa.C.S. § 9543(a)(2). The Commonwealth argues that Harris's affidavit is not after-discovered evidence entitling Appellant to relief

5. Alternatively, Appellant claimed in his PCRA petition that counsel was ineffective for failing to appeal the trial court's denial of his motion to withdraw. He has not renewed this argument in his brief to this Court.

6. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

for two reasons: first, because it was cumulative of her cross-examination testimony, and, second, it was not likely to compel a different result because the jury was already aware that her testimony was inconsistent with several other statements she made to police. The PCRA court rejected this claim, holding that Harris's recantation was not after-discovered evidence because it was cumulative of her cross-examination testimony in which trial counsel attempted to convince the jury of her unreliability and to emphasize her identification of Rucker. Additionally, the PCRA court held that this evidence was not likely to compel a different outcome at trial. Appellant presently disputes the PCRA court's conclusion that Harris's affidavit is cumulative of her cross-examination testimony. According to Appellant, Harris's affidavit is not cumulative because trial counsel was unsuccessful in eliciting testimony from her that Rucker was the shooter.

We have explained that when a petitioner is seeking a new trial based on alleged after-discovered evidence in the form of recantation testimony, the petitioner must establish that: (1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict. *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 541 (2009); *Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586, 595–96 (2007); *Commonwealth v. D'Amato*, 579 Pa. 490, 856 A.2d 806, 823 (2004); *Commonwealth v. Wilson*, 538 Pa. 485, 649 A.2d 435 (1994). Further, the proposed new evidence must be producible and admissible. *Scott*, 470 A.2d at 93.

We agree with the PCRA court that Appellant's after-discovered evidence claim fails. Harris's assertions that she saw Rucker, not Appellant, shoot Kelly, or that police pressure produced Harris's identification, are not after-discovered evidence because Appellant has not averred that he could not have obtained Harris's recantation or the circumstances of her in-court identification at, or prior to, the conclusion of trial through reasonable diligence. *See Johnson*, 966 A.2d at 541.

Harris explained in her affidavit that if counsel had interviewed her, she would have explained the truth. Because, by Harris's own account, the evidence here could have been obtained prior to trial through counsel's reasonable diligence, it is not after-discovered evidence entitling Appellant to relief. *See Wilson*, 649 A.2d at 448–49 (rejecting a similar after-discovered evidence claim based on a witness's recantation because the appellant had not shown that the content of the statement could not have been obtained at or prior to trial and the subject of the statement was fully explored in cross-examination).

## 2. *Brady*

According to Appellant, Harris's affidavit also demonstrates that the Commonwealth violated *Brady* by failing to disclose the material, exculpatory evidence that police coerced Harris's identification of Appellant. The Commonwealth argues that Appellant did not adequately develop this claim in his PCRA petition. The PCRA court did not consider Appellant's *Brady* argument.

Under *Brady*, the prosecution's failure to divulge exculpatory evidence is a violation of a defendant's Fourteenth Amendment due process rights. *Commonwealth v. Ly*, 602 Pa. 268, 980 A.2d 61, 75 (2009). A *Brady* claim challenges the Commonwealth's failure to produce material evidence. Specifically, Appellant must plead and prove that "(1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant; and (3) the suppression prejudiced the defendant." *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 244 (2006). *See also Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1126 (2008). The defendant bears the burden of demonstrating that the Commonwealth withheld or suppressed evidence. *See Ly*, 980 A.2d at 75; *Commonwealth v. Porter*, 556 Pa. 301, 728 A.2d 890, 898 (1999). In the PCRA context, a petitioner must demonstrate that the alleged *Brady* violation "so undermined the truth-determining process that no reliable adjudication of

guilt or innocence could have taken place." *Ly,* 980 A.2d at 75.

Although the PCRA court did not address this claim, we see no reason to remand because it is apparent from the record that it fails. A *Brady* claim is premised on the Commonwealth's suppression of material evidence. *Carson,* 913 A.2d at 244. As discussed above, Harris indicated that she would have revealed that her identification was coerced if counsel had interviewed her. By Harris's admission, therefore, the information contained in her affidavit was available to counsel. There is no indication whatsoever that the Commonwealth suppressed any evidence. Accordingly, this claim fails. *See Commonwealth v. Miller,* 605 Pa. 1, 987 A.2d 638, 655 (2009) ("a *Brady* violation will not afford a defendant relief if the defendant either knew of the existence of the evidence in dispute or could have discovered it by exercising reasonable diligence."); *Commonwealth v. Morris,* 573 Pa. 157, 822 A.2d 684, 696 (2003).

### 3. Counsel ineffectiveness

█ Appellant argues that trial counsel's performance was deficient because he did not interview Harris when he learned on the eve of trial that Harris would identify Appellant in court. Instead, Appellant continues, counsel ineffectively relied solely on Harris's prior statements to police to cross-examine her. According to Appellant, he was prejudiced by counsel's failure to interview Harris pre-trial because, if counsel had interviewed her, she would have told him about the police pressure to identify Appellant and ultimately would not have identified Appellant at trial. The Commonwealth Court argues that Appellant did not develop this claim in his PCRA petition. The PCRA court did not consider it.

█ It is well-established that "where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." *Commonwealth v. Colavita,* 993 A.2d 874, 887 (Pa.2010) (quoting *Commonwealth v. Howard,* 553 Pa. 266, 719

A.2d 233, 237 (1998)). "A finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Id.*

Counsel was aware that Harris would be the Commonwealth's identification witness, and that she had previously failed to identify Appellant and had identified Rucker. Trial counsel attempted to have the trial court suppress Harris' identification, and extensively cross-examined her to this end at the pre-trial suppression hearing.[7] He explored whether her identification of Appellant was the product of police pressure, and Harris insisted that it was not. At trial, knowing that Harris was a principal witness against Appellant, counsel explained to the jury that Harris had made six statements to police, had identified Rucker as the shooter in one of those statements, and had identified Appellant as the shooter in only the most recent statement, which she made shortly before trial. Counsel vigorously cross-examined Harris about her different identifications and impeached her credibility.

We cannot conclude that counsel's preparation for trial based on Harris's prior statements and forceful cross-examination of her lacked a reasonable basis. By engaging in an aggressive defense based on cross-examining Harris, counsel demonstrated that "he chose a particular course of action that had some reasonable basis designed to effectuate" Appellant's interests. *Colavita,* 993 A.2d at 887; *Washington,* 927 A.2d at 600. Counsel's conduct was not rendered ineffective solely because of his failure to interview this Commonwealth witness. *See Washington,* 927 A.2d at 601 (explaining that "we have never held that trial counsel is obligated to interview every

7. Specifically, at the suppression hearing, counsel cross-examined Harris about the voluntariness of her identification of Appellant to police two weeks before trial, and Harris denied the existence of police pressure to lie:

Counsel: What did they [the police] say to you?
Harris: Tell the truth.
Counsel: And did they tell you what the truth was?
Harris: No, I knew the truth.

Notes of Testimony (N.T.) 1/7/1985 at 39.

Commonwealth witness prior to trial").[8] A claim of ineffectiveness such as this cannot succeed solely through comparing, in hindsight, the trial strategy employed with alternatives not pursued. *Id.* at 600.

This is not a case where trial counsel completely failed to investigate or prepare a defense, as Appellant claims and as was the circumstance in the cases he relies upon. *See United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir.1997) (finding no reasonable basis where there was evidence of the defendant's psychosis but trial counsel did not pursue any investigation into an insanity defense); *United States v. Gray*, 878 F.2d 702, 712 (3d Cir.1989) ("Ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made."). Rather, trial counsel engaged in a defense premised on seeking suppression where appropriate of the Commonwealth witnesses's statements, and then vigorously and powerfully cross-examining them. This strategy gave Harris every opportunity to tell the truth and reveal police pressure at the suppression hearing and at trial. Accordingly, this claim fails.

## C. Prior acquittal

The third piece of evidence that Appellant claims proves his innocence relates to his prior acquittal on gun possession charges. On June 25, 1979, two days after the murder, Police Officer O'Donnell responded to a call about a man with a gun outside a bar in Philadelphia. *Smith*, 540 A.2d at 248. When the officer arrived, she saw Appellant with a gun visibly tucked into his waistband. *Id.* Appellant was arrested and charged with receiving stolen property, carrying a firearm

---

8. Indeed, the forceful cross-examination seemingly gave Harris every opportunity to disclose the alleged police coercion and the truth about who shot the victim. Moreover, recantation evidence such as this has been described as notoriously unreliable, particularly where the witness claims to have committed perjury. *See Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523 (2009); *Commonwealth v. D'Amato*, 579 Pa. 490, 856 A.2d 806, 825 (2004); *Commonwealth v. Dennis*, 552 Pa. 331, 715 A.2d 404, 416 (1998).

without a license, and carrying a firearm on public streets. He explained that he purchased the gun ten minutes before he was arrested from two men inside the bar, and, therefore, with regard to the Kelly murder, asserted that he was not involved and did not own the gun when Kelly was killed. Appellant was acquitted of the gun charges. At the murder trial, Appellant moved to dismiss the charges because of his previous acquittal. He argued that the prior acquittal should have, by application of the principles of collateral estoppel, precluded the Commonwealth from prosecuting him for the murder of Kelly. *Smith*, 540 A.2d at 250. We rejected this argument on direct appeal.

Appellant now argues that unspecified evidence from the prior acquittal is after-discovered evidence, evidence of a *Brady* violation by the Commonwealth, and that counsel was ineffective for failing to investigate the evidence presented at the gun charges trial.

### 1. After-discovered evidence

Appellant argues that unspecified evidence from his prior acquittal for gun possession is after-discovered evidence. The PCRA court held that this claim was previously litigated. The PCRA court's holding in this regard is not quite correct. Appellant's claim on direct appeal was that the Commonwealth was estopped from prosecuting him for murder because of his prior acquittal for gun possession. The distinct claim advanced on PCRA is that there is unspecified evidence from Appellant's acquittal that would have compelled a differed verdict at his murder trial. Despite not being previously litigated as the PCRA court concluded, Appellant's claim fails. He has not attempted to identify specifically what piece of evidence from his prior trial is after-discovered; nor has he explained why this evidence could not have been obtained at or prior to trial through reasonable diligence. *See Johnson*, 966 A.2d at 541. Indeed, the trial for gun charges occurred several years before the murder trial. We fail to see how unspecified evidence that existed prior to Appellant's murder

trial could form the basis for relief as after-discovered evidence.

## 2. *Brady*

■ According to Appellant, the Commonwealth violated *Brady* by withholding from trial counsel evidence from the gun charges trial that he asserts contradicted evidence introduced at the murder trial. The Commonwealth responds that the evidence Appellant claims the Commonwealth withheld is unspecified and does not exist. The notes of testimony from the gun charges trial were not transcribed, and the tapes have been destroyed. The PCRA court did not address this argument.

The Commonwealth cannot violate *Brady* by suppressing evidence that does not exist. *Commonwealth v. Lewis*, 560 Pa. 240, 743 A.2d 907, 910–11 (2000) (holding that there can be no *Brady* violation where the Commonwealth did not have the information requested). As we observed on direct appeal, there is no full record of the proceedings of the gun charges trial because the notes of testimony were not transcribed. *Smith*, 540 A.2d at 251. Because there are no notes or transcripts from Appellant's prior acquittal, the Commonwealth did not suppress any evidence from that trial. Additionally, Appellant has not identified a specific piece of evidence or information that the Commonwealth has withheld that contradicts evidence introduced at the murder trial. It is Appellant's burden to show that the Commonwealth withheld or suppressed evidence. *Ly*, 980 A.2d at 75. Appellant cannot satisfy this burden without identifying the evidence that the Commonwealth allegedly suppressed.

## 3. Ineffective assistance of counsel

■ Appellant argues that trial counsel was ineffective for failing to investigate the facts and evidence established at the gun charges trial and for failing to present evidence from the prior acquittal that would have demonstrated Appellant's innocence of the Kelly murder. Specifically, Appellant gave a statement to police at the time of his arrest on gun charges on

June 25, 1979, in which he informed police that he had just purchased the gun ten minutes earlier. At the homicide trial, Appellant also testified in his defense that he acquired the murder weapon two days after the murder. Appellant argues trial counsel should have introduced his prior consistent statement about the timing of the gun purchase and, if he had, there is a reasonable probability that the outcome of the trial would have been different. The PCRA court held counsel was not ineffective because he exploited the prior acquittal in closing arguments. Appellant argues that this was insufficient; counsel also should have introduced his prior consistent statement to bolster his testimony.

A prior consistent statement is admissible only if it is made before the declarant has a motive to fabricate. *See, e.g., Commonwealth v. Montalvo*, 604 Pa. 386, 986 A.2d 84 (2009); *Commonwealth v. Hutchinson*, 521 Pa. 482, 556 A.2d 370 (1989) (requiring that, to be admissible, a prior statement must have been made before any corrupt motive has arisen); *Commonwealth v. Gaddy*, 468 Pa. 303, 362 A.2d 217, 223 (1976) (plurality); Pa.R.E. 613(c) comment ("The use of the consistent statement will depend upon . . . all of the circumstances that prompted the making of the consistent statement; the timing of that statement, although not conclusive, is one of the factors to be considered."). On June 25, 1979, two days after the gun was used to kill Kelly, Appellant had a motive to lie about when he acquired it. Accordingly, his prior consistent statement would not have been admissible, and counsel was not ineffective for failing to attempt to introduce it.

## II. *Batson* and *Swain*

Appellant's next "issue" is premised on *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)[9] and *Swain v. Alabama*, 380 U.S. 202, 223, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Although Appellant has presented a global *"Batson"* challenge as one issue, we have identified five discrete claims within this issue, which we discuss below. With respect to

9. *Batson* was decided after Appellant's trial, but five days before counsel filed the last post-trial motion.

each of these five claims, Appellant relies on the same evidence regarding the prosecutor's use of peremptory challenges and the racial composition of the jury. Specifically, central to Appellant's contentions is his evidentiary proffer as follows, which was gathered from the *voir dire* record and an affidavit from an attorney who viewed trial counsel's contemporaneous written observations that purportedly indicate the races of the venirepersons: during jury selection, 35 African Americans and 64 Caucasians were questioned; of these, 47 were excused for cause, hardship, or by agreement, leaving 52 available for peremptory strikes or selection—16 African Americans and 36 Caucasians; of these, trial counsel struck 8 Caucasians, leaving 16 African Americans and 28 Caucasians for the prosecutor to strike or accept; the prosecutor used 17 peremptory strikes against 14 African Americans and 3 Caucasians, striking 88% of African Americans and 11% of Caucasians, while accepting 13% of African Americans and 89% of Caucasians; and the final jury, including alternates, constituted 2 African Americans and 13 Caucasians. The Commonwealth has stipulated that 12 jurors stricken by the prosecutor were African–American, 3 were Caucasian, and that trial counsel's notes indicate that 2 other stricken jurors were African American.

Additionally, as further relevant circumstances supporting a *prima facie* showing of discrimination, Appellant describes a culture of discrimination in the Office of the Philadelphia District Attorney as demonstrated by the following: an assertion by a former Philadelphia assistant district attorney that it was the general practice of prosecutors in that office to strike African American jurors; Philadelphia homicide prosecutions in other cases; a study conducted by Professor David Baldus regarding racially discriminatory jury selection in Philadelphia;[10] a 2003 report by the Pennsylvania Supreme Court Committee on Racial and Gender Bias in the Justice System; and a 1987 videotape of a lecture given by Philadelphia

---

**10.** *See Racial Discrimination and the Death Penalty in the Post–Furman Era: An Empirical and Legal Overview, with Recent Findings from Philadelphia,* David Baldus, George Woodworth, *et al.,* 83 Cornell L. Review 1638 (1998).

638

Prosecutor Jack McMahon advocating discrimination in jury selection.

Before addressing Appellant's five specific claims, a brief review of four controlling cases will help place them in context. First, the United States Supreme Court in *Swain* required a defendant alleging race discrimination in jury selection to show that the prosecution engaged in a systematic pattern of exclusion, based on race, over a series of cases. 380 U.S. at 227, 85 S.Ct. 824. Next, *Batson* expressly overruled *Swain* in this respect by establishing a three-part burden-shifting approach which allows a defendant to show purposeful discrimination in his own case. 476 U.S. at 95, 106 S.Ct. 1712. Pursuant to *Batson,* the defendant must make a *prima facie* showing of discrimination in jury selection, which shifts the burden to the prosecutor to articulate a race-neutral explanation for striking the jurors in question, and the trial court resolves whether the defendant has carried his burden of proving purposeful discrimination. *Batson,* 476 U.S. at 96–98, 106 S.Ct. 1712. Third, in *Commonwealth v. Uderra,* 580 Pa. 492, 862 A.2d 74, 86 (2004), we held that in cases on collateral review like the one before us, where no *Batson* challenge was raised during *voir dire* and the only viable claim is one of counsel ineffectiveness for failing to raise a *Batson* objection during *voir dire,* the post-conviction petitioner may not rely on *Batson's* burden-shifting formula, but instead bears the burden in the first instance and throughout of establishing actual, purposeful discrimination by a preponderance of the evidence. Next, in *Commonwealth v. Sneed,* 587 Pa. 318, 899 A.2d 1067, 1076–77 (2006), where *voir dire* occurred before *Batson,* we rejected the claim that appellate counsel was ineffective for failing to attempt to raise a *Batson* claim on direct appeal under this Court's then-existing relaxed waiver doctrine, because there was no guarantee that we would have analyzed this issue under relaxed waiver, and, moreover, because the lack of a supporting record constructed during *voir dire* would have rendered the appellate claim unsuccessful. With this context in mind, we now turn to our discussion of Appellant's five claims.

## A. *Batson* violation

██ First, although *Batson* was decided after Appellant's trial, Appellant claims he has established a *prima facie* showing of purposeful discrimination during *voir dire* as required by *Batson.* Appellant explains that the prosecutor's strikes were exercised disproportionately against African Americans, members of his race. *See Powers v. Ohio,* 499 U.S. 400, 416, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Appellant further asserts that the prosecutor's *voir dire* questioning was perfunctory, and the prosecutor struck certain African Americans with characteristics that would ordinarily be favored by the Commonwealth, making it more likely that the strikes were based on stereotypical assumptions. Finally, Appellant relies on the evidence described above as demonstrating a culture of discrimination in the prosecutor's office. The Commonwealth responds that Appellant's claim that the prosecutor violated *Batson* is waived because counsel did not object to the prosecutor's use of peremptory strikes during *voir dire.* The PCRA court rejected Appellant's claim, holding that Appellant was not entitled to retroactive application of *Batson.*

Having identified the respective arguments, we turn to our review of the law relevant to this claim. As noted above, prior to the decision in *Batson,* to establish a violation of equal protection in the jury selection process, a defendant was required to establish a pattern or practice of purposeful discrimination on the part of the prosecution occurring across multiple cases. *Swain; Basemore,* 744 A.2d at 728. In *Batson,* however, the U.S. Supreme Court held that such a requirement was overly burdensome, unworkable, and had the effect of immunizing prosecutors from constitutional scrutiny. *Batson,* 476 U.S. at 92–93, 106 S.Ct. 1712. The Court held that the Equal Protection Clause prohibits a prosecutor from challenging potential jurors on the basis of race in any case, and established a burden-shifting framework for analyzing claims of discrimination in jury selection. *See Commonwealth v. Cook,* 597 Pa. 572, 952 A.2d 594, 602–03 (2008) ("First, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck

one or more prospective jurors on account of race; second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination."); *see also Sneed,* 899 A.2d at 1075; *Uderra,* 862 A.2d at 83. This burden-shifting paradigm at the trial court level enables the trial court to issue findings of fact and credibility determinations, which will be accorded great deference on appeal. *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (explaining the role of the trial court in addressing a defendant's *Batson* claim at trial); *Cook,* 952 A.2d at 603; *Sneed,* 899 A.2d at 1076 (noting that "*Batson* contemplated a central role for the trial judge . . . in assessing the credibility of the neutral reasons for peremptory strikes proffered by the lawyer who exercised them.").

Turning to the facts of this case, and addressing Appellant's argument that the prosecutor's peremptory strikes were exercised disproportionately against African Americans in violation of *Batson,* we observe the timing of *Batson* in relation to Appellant's trial: Appellant was convicted on February 6, 1985; *Batson* was decided on April 30, 1986, fourteen months after trial and one week before counsel filed the last of several post-trial motions. The U.S. Supreme Court has held that *Batson* can be applied retroactively to matters pending on direct appeal at the time the case was decided. *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385, 395 (2003); *see also Abu–Jamal,* 555 A.2d at 849. However, it is well-settled that in order for a new law to apply retroactively to a case pending on direct appeal, the issue had to be preserved in the trial court and at all subsequent stages of the adjudication up to and including the direct appeal. *Freeman,* 827 A.2d at 395; *see also Commonwealth v. Marshall,* 596 Pa. 587, 947 A.2d 714 (2008); *Commonwealth v. Tilley,* 566 Pa. 312, 780 A.2d 649, 652 (2001); *Abu–Jamal,* 555 A.2d at 849; *Commonwealth v. Cabeza,* 503 Pa. 228, 469 A.2d 146, 148

(1983); *Commonwealth v. Hernandez*, 498 Pa. 405, 446 A.2d 1268 (1982).

To be entitled to the retroactive benefit of *Batson*, Appellant had to challenge the Commonwealth's use of peremptory challenges both at trial and on direct appeal. *See Sneed*, 899 A.2d at 1075. As he acknowledges, he did not do so. Appellant, therefore, is not entitled to the benefit of *Batson* in his quest to prove that the Commonwealth violated the Equal Protection Clause during *voir dire*. *Commonwealth v. Jones*, 597 Pa. 286, 951 A.2d 294, 303 (2008) (where *Batson* was decided during the pendency of a direct appeal, and no challenge to the Commonwealth's use of peremptory challenges was made during trial or on direct appeal, a PCRA petitioner is not entitled to the benefit of *Batson* ); *Marshall*, 947 A.2d at 719 (where Appellant did not preserve a *Batson* claim at trial, he is not entitled to retroactive application of *Batson* ); *Sneed*, 899 A.2d at 1075 ("Appellee would not be entitled to retroactive application of the *Batson* decision if this were a direct appeal, and he certainly is not entitled to its retroactive benefit on a collateral attack under the PCRA."); *see also Abu–Jamal*, 555 A.2d at 849 (in a pre-*Batson* case, finding waiver of challenge to prosecutor's use of peremptory challenges for failing to raise it before the trial court); *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974) (holding that allegations of error must be preserved). Accordingly, because Appellant did not object during *voir dire*, he did not preserve a challenge to the Commonwealth's use of peremptory strikes. Because he did not preserve his challenge, he is not entitled to the retroactive application of *Batson*, and cannot succeed on this claim.

### B. Ineffective assistance of counsel in post-trial motions and on appeal

What is cognizable and not waived under the PCRA are Appellant's derivative claims of counsel ineffectiveness for failing to challenge the prosecutor's use of peremptory challenges based on *Batson* in post-trial motions and on direct

appeal. It is to these arguments that we turn, and which, for the reasons identified below, we discuss together.

Appellant argues that because *Batson* was decided a week before trial counsel filed the last of several supplemental post-trial motions, trial counsel was ineffective for not challenging the prosecutor's use of peremptory strikes as violating *Batson.* Appellant argues that reasonable trial counsel would have raised *Batson* in post-trial motions notwithstanding the absence of an objection to the prosecutor's peremptory strikes during *voir dire.* Additionally, Appellant argues that counsel was ineffective for failing to raise a *Batson* claim on direct appeal. According to Appellant, under this Court's relaxed waiver rules, we would have addressed the *Batson* claim on direct appeal notwithstanding trial counsel's failure to challenge the prosecutor's jury selection during *voir dire. See, e.g., Commonwealth v. Abu–Jamal,* 521 Pa. 188, 555 A.2d 846, 850 (1989). Appellant supports both of these assertions with the same evidence discussed above, regarding the prosecutor's use of peremptory challenges, the racial composition of the jury, and an alleged "culture of discrimination."

Responding to these arguments of counsel ineffectiveness, the Commonwealth argues that where a claim of racial discrimination was not preserved at trial, a defendant may not simply make a *prima-facie* showing of discrimination in accord with *Batson's* burden-shifting approach, but must prove actual, purposeful discrimination by a preponderance of the evidence in accord with *Uderra,* 862 A.2d 74. The Commonwealth argues that Appellant has not recognized his burden under the PCRA pursuant to *Uderra,* or attempted to meet it. The PCRA court did not consider Appellant's claims of post-trial or appellate ineffective assistance of counsel in this regard.

Appellant has not developed these two assertions of trial counsel ineffectiveness separately, and we see no need to discuss them discretely. Whether a waived *Batson* claim is raised post-trial or on direct appeal, it presents the same difficulties. Both instances of alleged ineffectiveness occurred long after the conclusion of *voir dire. Batson* contemplated a

central role for the trial judge in assessing whether the defendant had established a *prima facie* case of purposeful discrimination, and, if so, in assessing the credibility of the race-neutral reasons offered by the prosecutor. *See Sneed,* 899 A.2d at 1076. Therefore, a *Batson* claim must be raised during *voir dire*. When *Batson* is not raised during *voir dire*, and the argument is that counsel was ineffective for not raising the argument for the first time in post-trial motions or on appeal, a PCRA petitioner must overcome the hurdles associated with the absence of a trial court record. *See Ford v. Georgia,* 498 U.S. 411, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991) (stating in *dictum* that "[t]he requirement that any *Batson* claim be raised not only before trial, but in the period between the selection of the jurors and the administration of their oaths, is a sensible rule."). Therefore, we consider together these two contentions of ineffectiveness.

Because trial counsel did not object to the prosecutor's use of peremptory challenges during *voir dire,* Appellant is arguing counsel ineffectiveness for failing to raise an unpreserved claim. Appellant claims that his evidentiary proffer establishes a *prima facie* case of discrimination in accord with *Batson* and proves that counsel was ineffective for failing to raise what would have been a meritorious *Batson* argument post-trial and on appeal. We have held, however, that in order to succeed on an unpreserved claim of racial discrimination in jury selection in the context of a claim of ineffective assistance of counsel, a post-conviction petitioner may not rely on the burden-shifting paradigm established by *Batson.* Rather, he must prove by a preponderance of the evidence, in the first instance and throughout, actual, purposeful discrimination by the prosecutor, in addition to all other requirements essential to overcome waiver of the underlying claim. *Uderra,* 862 A.2d at 87; *see also Commonwealth v. Williams,* 581 Pa. 57, 863 A.2d 505, 514–15 (2004). Placing this high burden on a post-conviction petitioner comports with the heightened criteria for obtaining post-conviction relief. *Uderra,* 862 A.2d at 86. Contrary to his obligation under *Uderra,* Appellant presents his argument in terms of *Batson's* burden-shifting ap-

proach. *See Commonwealth v. Ligons,* 601 Pa. 103, 971 A.2d 1125, 1142 (2009) (explaining that a post-conviction petitioner is not entitled to rely on *Batson's* burden shifting approach, but instead bears the burden in the first instance and throughout of establishing actual, purposeful discrimination by a preponderance of the evidence).

Additionally, Appellant has not acknowledged the difficulties we discussed in *Sneed.* In *Sneed,* as here, *Batson* was decided after trial during the pendency of the appeal. On collateral review, the PCRA court granted relief on Sneed's claim that the prosecutor at his 1985 trial used his peremptory challenges in a racially discriminatory manner in violation of *Batson.*[11] We reversed the PCRA court, holding that the only cognizable claim was that of counsel ineffectiveness for failing to raise a *Batson* challenge on direct appeal. We observed that because there had been no objection to the use of peremptory challenges at trial, the claim was one of counsel ineffectiveness for failing to raise a waived claim on appeal by invoking direct capital review relaxed waiver. *Id.* at 1076. We held, however, that in faulting counsel for failing to do so, Sneed "ignores that this [C]ourt's relaxed waiver doctrine was discretionary, and thus, there was no guarantee that we would have analyzed this issue under the relaxed waiver doctrine." *Id.* at 1076 (citing *Commonwealth v. Duffey,* 585 Pa. 493, 889 A.2d 56, 64 (2005)).

Additionally, this Court in *Sneed* reasoned that "belatedly faulting counsel for failing to seek the benefit of the new *Batson* rule on direct appeal overlooks the practical hurdles that would have derailed such an endeavor," *id.* at 1076; specifically, the lack of findings by the trial court. In *Sneed,* we thus rejected the argument that counsel was ineffective for failing to raise a claim on appeal premised on *Batson* when there was no record upon which to construct such a claim. *Id.* ("The fact-intensive nature of a *Batson* claim, thus, negates

11. The PCRA court in *Sneed* did not have the benefit of our decision in *Uderra,* which was decided after the PCRA court granted relief, and obviously could not be considered with respect to the showing required. *Sneed,* 899 A.2d at 1073 n. 9.

the notion that one could successfully argue such a claim for the first time on appeal, with no supporting record, and have any reasonable prospect of success").

Because Appellant did not object to the prosecutor's use of peremptory challenges during *voir dire,* his claims of post-trial or appellate counsel ineffectiveness are, likewise, premised on counsel's failure to raise a waived claim. Although counsel could have invoked direct capital review relaxed waiver, as we observed in *Sneed,* this doctrine was discretionary and did not guarantee that we would have analyzed the waived *Batson* claim. *Sneed,* 899 A.2d at 1076; *Freeman,* 827 A.2d at 400 n. 9 ("The relaxed waiver practice ... was not absolute, but discretionary."). Moreover, as in *Sneed,* counsel would have had to overcome the lack of a trial record upon which to evaluate the claim of racial discrimination in jury selection. The only evidence Appellant has offered regarding the races of the venirepersons is an affidavit from an attorney who spoke to trial counsel and reviewed the notes trial counsel purportedly made during *voir dire,* in which counsel noted the race and gender of every potential juror, and the Commonwealth stipulation that 12 jurors stricken by the prosecutor were African–American, 3 were Caucasian, and trial counsel's notes indicate that 2 other stricken jurors were African American.[12] Appellant additionally asserts his belief that several African American venirepersons exhibited characteristics that should have been appealing to the Commonwealth, suggesting that the only reason they were stricken was their race. Appellant also adverts to an alleged "culture of discrimination" in the prosecutor's office.

This evidence and Appellant's assertions do not rectify the absence of a full and complete trial record for appellate review. "*Batson* contemplated a central role for the trial judge both in assessing whether a *prima facie* case was made out, and if so, in assessing the credibility of the neutral reasons for peremptory strikes proffered by the lawyer who exercised them." *Sneed,* 899 A.2d at 1076. In this case, as in *Sneed,* counsel had no such record or findings to rely upon.

12. Appellant has not offered an affidavit from trial counsel.

Therefore, "the fact-intensive nature of a *Batson* claim ... negates the notion that one could successfully argue such a claim for the first time on appeal, with no supporting record, and have any reasonable prospect of success." *Id.* at 1076–77.

Additionally, we have repeatedly rejected the evidence Appellant offers as supporting a claim of discrimination by the prosecutor. Specifically, we have held that the McMahon tape itself does not suffice to establish a pattern or practice of discrimination on the part of the Philadelphia District Attorney's office. *Ligons,* 971 A.2d at 1145–46; *Jones,* 951 A.2d at 305; *Washington,* 927 A.2d at 610; *Commonwealth v. Rollins,* 558 Pa. 532, 738 A.2d 435, 443 (1999) (holding that the McMahon tape did not demonstrate that there was discrimination in the petitioner's case). We have similarly rejected speculative arguments based on the Baldus study. *See Washington,* 927 A.2d at 610; *Williams,* 863 A.2d at 523; *Commonwealth v. Morris,* 573 Pa. 157, 822 A.2d 684, 698 (2003). Finally, Appellant's claims of a culture of discrimination and reference to other cases in which Pennsylvania courts have found discriminatory use of peremptory challenges by the prosecutor are too speculative and attenuated to demonstrate actual, purposeful discrimination in Appellant's trial. *See Ligons,* 971 A.2d at 1145. Thus, in accord with *Sneed,* Appellant's attempt to raise his waived *Batson* claim *via* a claim of ineffective assistance of counsel either post-trial or on appeal fails.

### C. *Swain* violation

Next, Appellant argues that the Commonwealth committed an equal protection violation pursuant to *Swain v. Alabama,* 380 U.S. 202, 223, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), because the prosecutor, "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negros" who were otherwise qualified to serve as jurors. Although Appellant acknowledges the heavy evidentiary burden imposed by *Swain,* he argues that his evidentiary proffer entitles him to a hearing. The Commonwealth responds that

there was no evidence that the prosecutor violated *Swain*. The PCRA court did not address this claim. Because Appellant made no attempt to object to the prosecutor's peremptory challenges under the then-prevailing rules of *Swain*, this claim is waived. 42 Pa.C.S. § 9544(b).

D. Ineffective assistance of counsel during *voir dire*

 Finally, Appellant argues that trial counsel observed the prosecutor striking African American potential jurors on account of race, and ineffectively failed to object premised on *Swain*. The Commonwealth argues that there were no grounds for a *Swain* objection. The PCRA court, once again, did not address this claim.

This claim fails for two reasons. First, *Swain* imposed a very high burden on defendants, who were required to establish a pattern or practice of purposeful discrimination on the part of the prosecution occurring across multiple cases to be successful in any peculiar case. In fact, *Batson* overturned *Swain* because of this high burden, which the High Court described as being "overly burdensome, unworkable, and having the effect of immunizing prosecutors from constitutional scrutiny." *Batson*, 476 U.S. at 92–93, 106 S.Ct. 1712. Where *Swain* violations have been found, they are usually premised on admissions by the prosecuting attorney. *Id.; see also Jackson v. Herring*, 42 F.3d 1350, 1357 (11th Cir.1995) (finding a *Swain* violation, *inter alia*, on the basis of testimony from "the former prosecuting attorney himself . . . that there was widespread and systematic misuse of peremptories by the Tuscaloosa D.A.'s office," although dismissing the claim based upon state procedural default analysis); *State v. Washington*, 375 So.2d 1162, 1164 (La.1979) (finding *Swain* violation on the basis of, *inter alia*, evidence that "the prosecutor himself admits that, solely on the basis of race and without examination as to the individual's particular qualifications or predilections, he consistently excuses black veniremen through the use of his peremptory challenges when the defendant himself is black."). Appellant has not offered any such admission by the prosecutor, and has not provided any information about the

prosecutor's use of peremptory challenges in other cases. Although he has made assertions about other prosecutors from the Philadelphia District Attorney's Office at about the time this case was heard, such assertions are too speculative and attenuated to prove that the prosecutor in his trial engaged in a pattern or practice of purposeful discrimination occurring across multiple cases. Appellant, therefore, has not pled sufficient facts to prove there is arguable merit to this claim of counsel ineffectiveness. *See Pierce*, 527 A.2d at 975.

Perhaps Appellant believes that if counsel had objected to the prosecutor's use of peremptory challenges premised on *Swain*, then counsel would have preserved for appeal a claim that the prosecutor violated *Batson*. To the extent Appellant believes a *Swain* objection would have preserved for appeal a *Batson* claim of discrimination in jury selection, however, he is mistaken. We have expressly refused to equate the standards of *Swain* and *Batson*, and have held that a *Swain* objection would not have preserved a *Batson* claim for appellate review. *See Commonwealth v. Griffin*, 537 Pa. 447, 644 A.2d 1167, 1172 (1994) (where the defendant was convicted before *Batson* and raised a PCRA claim of counsel ineffectiveness for failing to object to the prosecutor's use of peremptory strikes premised on *Swain*, we said that the defendant was essentially asking the court to equate the *Batson* standard with the earlier standard of *Swain*, which we would not do because of the different burdens of proof between the two standards).

### III. Mental Health Evidence

Appellant makes three claims of trial counsel ineffectiveness and one claim that the Commonwealth violated *Brady*, each premised on his various mental impairments. The PCRA court did not address any of these claims. Before describing and addressing them specifically, we will review the evidence Appellant has offered in support thereof. As to each claim, Appellant offers that he is prepared to demonstrate that at the time of the offense and trial he suffered from major mental illnesses, brain damage, serious cognitive impairments, substance dependence, and an array of other debilitating mental

and emotional problems. He claims that various documents substantiate these assertions.

Specifically, Appellant proffered the following evidence of mental impairments: a June 31, 1968, court psychiatric report prepared for the Philadelphia Court of Common Pleas concluding that Appellant suffers from "mental deficiency," is "impulsive," easily influenced by others, and has "limited" development; an August 16, 1971, prison psychologist evaluation stating that Appellant's IQ was 76 ("which corresponds to the 6th percentile"), his "academic potential is at an elementary level," and he is easily influenced by others; school records, which reveal that Appellant had serious cognitive and intellectual deficits from an early age and was functioning in the mentally retarded range; 1973 Danville State Hospital records, revealing that Appellant was committed to a mental hospital because he was "hallucinated, paranoid, and acutely disturbed," was diagnosed as schizophrenic, paranoid, borderline retarded, and prescribed a variety of psychotropic medications; 1973–75 Fairview State Hospital Records, which show that Appellant's mental illness caused him to be involuntarily psychiatrically institutionalized from June 1, 1973 through August 29, 1975, demonstrate the existence of brain damage, and describe Appellant's hallucinations and drug use; a 1979 court mental health evaluation performed following Appellant's arrest on gun charges, which further documents Appellant's history of mental illness and dysfunction; a 1984 court presentence report and mental health evaluation performed following Appellant's conviction on unrelated charges of reckless endangerment, aggravated assault, and possessing an instrument of a crime, stating that Appellant maintained strong, loving family relationships, was an obedient child, but suffered from paranoid schizophrenia and his rehabilitation plan should include a psychiatric basis; a 1985 court mental health evaluation prepared post-trial for this capital case, which further documents Appellant's mental health maladies; family members, who Appellant asserts were available at the time of trial to offer testimony about Appellant's unstable and

traumatic childhood; and other expert mental health evidence based on reviews of this evidence.

Additionally, according to Appellant, trial counsel failed to do the following: obtain records documenting Appellant's long history of mental problems; interview family members about Appellant's history; and obtain a mental health evaluation for use at trial. Appellant argues that counsel's deficiency in failing to investigate his client's mental health is particularly striking because the 1979 and 1984 reports were created for the court in connection with two prior cases relevant to the capital trial: the 1979 report was prepared during Appellant's trial for possessing the murder weapon, and the 1984 report was prepared in connection with a conviction that the Commonwealth used as an aggravating circumstance in the capital penalty phase. If counsel had obtained these two reports, Appellant argues they would have provided vital information that would have propelled further investigation and led to the discovery of the wealth of mental health evidence listed above.

We now turn to Appellant's claims premised on this mental health evidence.

## A. Incompetency

 Appellant argues that under the Sixth Amendment, counsel had a duty to investigate thoroughly his background and mental health for purposes of developing evidence of incompetency, and, if counsel had done so and requested a pre-trial competency hearing, there is a reasonable probability that the trial court would have found Appellant incompetent to stand trial. The Commonwealth argues that Appellant has failed to provide any evidence to support his claim that he was actually incompetent at the time of trial.

 A defendant is presumed to be competent to stand trial. *Commonwealth v. Rainey*, 593 Pa. 67, 928 A.2d 215, 236 (2007); *Commonwealth v. duPont*, 545 Pa. 564, 681 A.2d 1328, 1330–31 (1996). The burden, therefore, is on Appellant to prove, by a preponderance of the evidence, that he was incompetent to stand trial. *Rainey*, 928 A.2d at 236; *Commonwealth v. Brown*, 582 Pa. 461, 872 A.2d 1139, 1156 (2005).

To prove that he was incompetent, Appellant must establish that he was either unable to understand the nature of the proceedings against him or to participate in his own defense. 50 P.S. § 7402(a); *Rainey*, 928 A.2d at 236; *Brown*, 872 A.2d at 1139; *Hughes*, 555 A.2d at 1270. To obtain a hearing on this claim, Appellant would have to proffer evidence sufficient to meet this burden.

Appellant proffered to the PCRA court extensive evidence of mental impairments that he asserts demonstrates that he was incompetent to stand trial. Specifically, Appellant presented evidence that he has a lifelong history of significant cognitive dysfunction and major mental illness; suffered from schizophrenia at the time of the offense and trial; suffered childhood trauma; and has a history of drug and alcohol dependence. Appellant also offered an affidavit from Richard G. Dudley, Jr., M.D., a medical doctor and psychiatrist, who reviewed Appellant's records and performed a psychiatric examination of him. Dr. Dudley concluded that based upon Appellant's history, "there clearly are substantial questions about whether [Appellant] was competent to proceed at the time of his capital trial." Affidavit of Dr. Dudley, PCRA Exhibit R, at 12.

Appellant's assertions, and the mental health evidence on which they are based, are insufficient to meet the high burden to which he is held to demonstrate that he was prepared to prove that he was actually incompetent to stand trial. In fact, Appellant does not assert that he was actually incompetent; mirroring Dr. Dudley's analysis, he states that he "has raised substantial questions about whether he was incompetent at the time of the original trial court proceedings." Appellant's Brief at 50. Dr. Dudley's and Appellant's assertions that there are substantial questions about Appellant's competency, even if believed, do not satisfy Appellant's burden to prove that he was incompetent to stand trial. *See Rainey*, 928 A.2d at 236 (doctor's assertion that a competency evaluation would have been appropriate did not satisfy the appellant's burden to prove that he was actually incompetent at the time of trial); *Commonwealth v. Romero*, 595 Pa. 275, 938 A.2d 362, 374–75

(2007) (finding appellant's claim of incompetency meritless where he presented evidence about his capacity to form specific intent, his low level of intelligence, and whether he had organic brain syndrome, but did not present evidence that his mental deficiency would have prevented him from understanding what his trial was about or from cooperating with trial counsel); *Brown*, 872 A.2d at 1156 (finding that doctor's "significant questions" about the appellant's capacity to assist trial counsel was not a statement that appellant was incompetent at trial and therefore did not satisfy appellant's burden). Without evidence that he was actually incompetent to stand trial, Appellant cannot prevail on a claim that counsel was ineffective for failing to obtain a competency hearing.

## B. Insanity

Next, Appellant argues that under the Sixth Amendment, counsel had a duty to investigate thoroughly his background and mental health for purposes of developing evidence for the guilt phase mental-state defense of insanity. The Commonwealth argues that counsel is not ineffective for declining to investigate and pursue an insanity defense where such a defense would conflict with the defendant's sworn testimony in furtherance of his defense strategy. *See Commonwealth v. Laird*, 555 Pa. 629, 726 A.2d 346, 353–54 (1999); *Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251, 1264 (1994). Moreover, addressing the substance of the mental health evidence offered by Appellant, the Commonwealth argues that there is nothing that existed prior to or at the time of trial to support an insanity defense. Specifically, according to the Commonwealth, Appellant has not explained how any of the evidence he offers would have established that he did not know that what he was doing was wrong.

Although Appellant mentions that his mental impairments could have provided a defense of insanity, *see* Appellant's Brief at 44, he has not developed this assertion in any meaningful way. In order to prevail on an insanity defense, Appellant must prove by a preponderance of the evidence that, at the time he committed the offense, due to a defect of

reason or disease of mind, he either did not know the nature and quality of the act or did not know that the act was wrong. 18 Pa.C.S. § 315; [13] *Commonwealth v. Heidnik,* 526 Pa. 458, 587 A.2d 687, 690–91 (1991).

A defense of insanity acknowledges commission of the act by the defendant, while maintaining the absence of legal culpability. *Commonwealth v. Hughes,* 581 Pa. 274, 865 A.2d 761, 788 (2004); *Commonwealth v. Cross,* 535 Pa. 38, 634 A.2d 173, 175 (1993). Where a defendant has testified at trial and has denied committing a crime, this Court has declined to deem counsel ineffective for failing to present a defense that would have been in conflict with his client's own testimony. *Hughes,* 865 A.2d at 788; *Commonwealth v. Paolello,* 542 Pa. 47, 665 A.2d 439, 455 (1995). Here, Appellant did not admit to committing the act. Rather, he testified in his defense at trial that he did not participate in the crime and was not even near the crime scene at the time of the murder. N.T. 1/31/1985 at 98, 106. Indeed, he continues to maintain his innocence to this Court. As Appellant specifically denied having committed the offenses, under this Court's precedent, counsel cannot be held ineffective for failing to present an inconsistent defense.

## C. Diminished capacity

Next, Appellant argues that under the Sixth Amendment, counsel had a duty to investigate thoroughly his background and mental health for purposes of developing evidence for the guilt phase mental-state defense of diminished capacity. Specifically, Appellant argues that he had diminished

13. 18 Pa.C.S. § 315 provides:
(a) General rule.—The mental soundness of an actor engaged in conduct charged to constitute an offense shall only be a defense to the charged offense when the actor proves by a preponderance of evidence that the actor was legally insane at the time of the commission of the offense.
(b) Definition.—For purposes of this section, the phrase "legally insane" means that, at the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong.

capacity at the time of the murder, he therefore lacked the specific intent to kill, and if counsel had presented evidence of Appellant's mental health to the jury, there is a reasonable probability that the jury would have convicted him of third-degree murder or manslaughter.

The Commonwealth argues that the defense of diminished capacity, which requires a defendant to admit that he killed the victim, *see Hughes*, 865 A.2d at 788, was inconsistent with Appellant's trial testimony that he did not participate in the crime. The Commonwealth therefore asserts that counsel is not ineffective for declining to investigate and pursue a defense where such a defense would conflict with the defendant's sworn testimony. *See Laird*, 726 A.2d at 353–54; *Williams*, 640 A.2d at 1264. Moreover, addressing the substance of the mental health evidence offered by Appellant, the Commonwealth argues that there is nothing that existed prior to or at the time of trial to support a diminished capacity defense, and Appellant has not explained how any of the evidence he offers would have established that he was incapable of forming the specific intent to kill.

We have explained that by asserting the limited defense of diminished capacity, "a defendant is attempting to prove that he was incapable of forming the specific intent to kill; if the defendant is successful, first degree murder is mitigated to third degree." *Commonwealth v. Legg*, 551 Pa. 437, 711 A.2d 430 (1998) (citing *Commonwealth v. Travaglia*, 541 Pa. 108, 661 A.2d 352, 359 (1995)); *see also Commonwealth v. Williams*, 602 Pa. 360, 980 A.2d 510, 527 (2009); *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1131–32 (2008). Thus, to assert this defense, "the defendant admits general criminal liability, but seeks to reduce the degree of guilt to third degree murder." *Legg*, 711 A.2d at 433 (citing *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982)).

Appellant did not admit to general criminal liability, and instead, as noted, testified in his defense that he did not participate in the crime in any way. N.T. 1/31/1985 at 98, 106. Where a defendant has denied committing a crime during his

trial testimony, we will not find counsel ineffective for failing to present a defense that would have conflicted with such testimony. *Williams,* 980 A.2d at 527; *Gibson,* 597 Pa. 402, 951 A.2d 1110, 1131–32 (2008); *see also Commonwealth v. Spotz,* 587 Pa. 1, 896 A.2d 1191, 1218 (2006); *Hughes,* 865 A.2d at 788; *Commonwealth v. Williams,* 577 Pa. 473, 846 A.2d 105, 111 (2004); *Laird,* 726 A.2d at 353–54; *Paolello,* 665 A.2d at 455. The defense of diminished capacity would directly contradict Appellant's sworn testimony and require this Court to assume that Appellant committed perjury at his trial. This we will not do. Accordingly, Appellant's claim of counsel ineffectiveness for failing to investigate mental health evidence and present the defense of diminished capacity fails.

## D. *Brady*

 Appellant also asserts that the Commonwealth violated *Brady* by failing to disclose to the defense the substantial information about his mental impairments that was in its actual or constructive possession, specifically, the 1979 and 1984 court records and the Danville and Fairview State Hospital records. To prevail on this claim, Appellant must plead and prove that "(1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant; and (3) the suppression prejudiced the defendant." *Carson,* 913 A.2d at 244. The defendant bears the burden of demonstrating that the Commonwealth withheld or suppressed evidence. *See Ly,* 980 A.2d at 75; *Porter,* 728 A.2d at 898. A *Brady* claim, however, will not afford Appellant relief if he either knew of the existence of the evidence in dispute or could have discovered it by exercising reasonable diligence.

The Commonwealth violates *Brady* when it fails to turn over to the defense information that is in the Commonwealth's exclusive control. *Spotz,* 756 A.2d at 1154 (the Commonwealth's obligation under *Brady* does not extend to evidence equally available to defense). Here, the 1979 and 1984 court records and the Danville and Fairview State Hospital records were equally accessible to the defense, as demonstrated by his

ability to obtain them for PCRA review. Consequently, there was no *Brady* violation. *Commonwealth v. Miller,* 560 Pa. 500, 746 A.2d 592, 600 (2000) (rejecting a *Brady* claim premised on the Commonwealth's failure to produce records about the defendant from state-run hospitals because the records were equally available to the prosecution and the defense); *Commonwealth v. Pursell,* 555 Pa. 233, 724 A.2d 293, 305 (1999) (no *Brady* violation where the prosecution failed to turn over to the defense evidence that is readily obtainable by the defense). This claim, therefore, does not entitle Appellant to relief.

## IV. *Sua Sponte* Competency Hearing

In a related argument, Appellant argues that the trial court violated his due process rights by failing to hold a competency hearing *sua sponte.* According to Appellant, the trial court was aware of evidence indicating Appellant's incompetency and should have ordered a competency hearing based on this evidence, notwithstanding counsel's failure to request one. *See Cooper v. Oklahoma,* 517 U.S. 348, 354 n. 4, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) ("The right not to stand trial while incompetent is sufficiently important to merit protection even if the defendant has failed to make a timely request for a competency determination."); *see also Drope v. Missouri,* 420 U.S. 162, 171–72, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) (where the trial court is aware of "*indicia* of possible incompetency," it must hold a competency hearing). Specifically, according to Appellant, the trial court became aware of the 1968, 1971, and 1973 mental health reports as the penalty phase was about to begin, and received the 1985 mental health evaluation shortly after trial. Appellant argues that these reports alerted the court to *indicia* of incompetency, and that the trial court should have *sua sponte* held a competency hearing based on this evidence.

The Commonwealth argues that this claim is waived because Appellant did not raise it on direct appeal. 42 Pa.C.S. § 9544(b). The Commonwealth further observes that Appellant has not explained why the trial court should have ordered

a competency hearing before the guilt phase based on mental health reports it became aware of just prior to the start of the penalty phase. Finally, the Commonwealth argues that this claim fails because Appellant has presented no evidence to support his claim that he was incompetent. Once again, the PCRA court did not address this issue.

We agree with the Commonwealth. Appellant's claim that the trial court should have ordered a competency hearing notwithstanding his failure to request one is waived, as it was not raised on appeal. 42 Pa.C.S. § 9544(b). Moreover, as discussed above in connection with Appellant's claim of trial counsel ineffectiveness for failing to request a pre-trial competency hearing, Appellant has not produced evidence indicating that he was actually incompetent to stand trial. Finally, the case upon which Appellant relies, *Drope*, involves factual circumstances where the trial court was aware of *indicia* of incompetency before and during trial. 420 U.S. at 174, 95 S.Ct. 896 ("In the present case there is no dispute as to the evidence possibly relevant to petitioner's mental condition that was before the trial court prior to trial and thereafter."). In contrast, Appellant asserts that the trial court received *indicia* of incompetency after trial. He has not developed how the trial court could have violated his due process rights at and before trial by failing to act on certain evidence that the trial court was unaware of until after trial. Consequently, Appellant is entitled to no relief on this claim.

## V. Statute of Limitations

In his next argument, Appellant argues that counsel was ineffective for failing to move to quash the charges of conspiracy to commit murder and possession of an instrument of crime (PIC) as time-barred. According to Appellant, his prosecution for these crimes was barred because the applicable two-year statute of limitations had expired by the time of his trial. *See* 42 Pa.C.S. §§ 5551–52.[14] According to Appellant, he committed PIC no later than June 25, 1979, when he

14. In 1984 the legislature eliminated the statute of limitations for conspiracy to commit murder. *See* 1984 P.L. 199 (Dec. 14, 1984), codified at 42 Pa.C.S. § 5551.

was arrested and charged with receiving stolen property, carrying a firearm without a license, and carrying a firearm on a public street. Accordingly, Appellant argues that the statute of limitations expired in June 1981. Similarly, he argues that the object of the conspiracy occurred on June 23, 1979, when the victim was murdered, and the statute of limitations expired two years later in June 1981. Because his prosecution for these two crimes was time-barred, Appellant claims counsel should have moved to quash these charges and should have litigated this issue on appeal. Appellant has confined his argument to the merits and has not addressed the cognizability of this issue pursuant to the PCRA.

The Commonwealth responds that this claim is not cognizable under the PCRA because Appellant has already served the sentences imposed for the crimes of conspiracy and PIC. *See* 42 Pa.C.S. § 9543(a)(1) (conditioning PCRA relief on the petitioner currently serving a sentence of imprisonment, probation or parole for the crime). The PCRA court rejected this claim on the merits, finding that the conspirators engaged in a cover-up that lasted until October 1982, when Green admitted her involvement and implicated Appellant, and, by these actions, the conspirators, including Appellant, tolled the statute of limitations.

Although the PCRA court reached the merits of this argument, we agree with the Commonwealth that this claim is not cognizable under the PCRA. To be "eligible for relief under the PCRA, a petitioner must be: (i) currently serving a sentence of imprisonment, probation or parole for the crime ..." 42 Pa.C.S. § 9543(a)(1). We have construed this provision to preclude PCRA relief where the petitioner is no longer serving a sentence for the crime at the time the PCRA court renders a decision. *Commonwealth v. Ahlborn,* 548 Pa. 544, 699 A.2d 718 (1997).

Appellant was sentenced to five to ten years' imprisonment for conspiracy and two-and-one-half to five years' imprisonment for PIC, to run consecutively to each other and concurrently with the death sentence. The result was a maximum aggregate sentence of fifteen years' imprisonment for conspir-

acy and PIC. Appellant has remained in custody since July 3, 1984. Therefore, as the Commonwealth observes, Appellant's maximum sentence for conspiracy and PIC expired on July 3, 1999, more than a year before the PCRA court initially ruled on his PCRA petition. Accordingly, because Appellant was no longer serving a sentence for conspiracy or PIC at the time the PCRA court ruled on his petition, he is not entitled to relief on this claim. 42 Pa.C.S. § 9543(a)(1); *Ahlborn*, 699 A.2d at 720.

## VI. Accomplice Witness Charge

Next, Appellant raises a claim of counsel ineffectiveness regarding the trial court's accomplice witness charges. As background, this claim involves the testimony of Commonwealth witnesses Green and Rucker, and the adequacy of the trial court's jury charge regarding these witnesses. Both witnesses were unsentenced co-conspirators who had pled guilty to conspiracy and third-degree murder and testified for the Commonwealth. Trial counsel requested a "corrupt and polluted source" charge with respect to these witnesses.[15] The trial court declined to give the standard charge, however, and instead instructed the jury as follows:

> Kimberleigh Green and Levi Rucker are unsentenced co-conspirators of the defendant—are unsentenced co-conspirators allegedly in the conspiracy with this defendant and they have testified on behalf of the Commonwealth. In your

[15]. At the time of Appellant's trial this instruction, the Accomplice Testimony instruction 4.01 of the Pennsylvania Suggested Standard Jury Instructions: Criminal section (revised October 1981), provided in relevant part as follows:

> When a Commonwealth witness was so involved in the crime charged that he was an accomplice, his testimony is to be judged by special precautionary rules. Experience shows that an accomplice, when caught, will often try to place the blame falsely on someone else.
>
> &ast; &ast; &ast;
>
> These are the special rules that apply to accomplice testimony: First, you should view the testimony of an accomplice with disfavor because it comes from a corrupt and polluted source. Second, you should examine the testimony of an accomplice closely and accept it only with care and caution.

*Commonwealth v. Chmiel*, 536 Pa. 244, 639 A.2d 9, 12 (1994).

deliberations you may bear that in mind in assessing the credibility of their testimony as witnesses.

N.T. 2/1/1985 at 167. Counsel objected to this charge as invalid, and the trial court overruled the objection. Counsel did not challenge the trial court's accomplice charge on direct appeal.[16]

Appellant argues that counsel was ineffective for failing to challenge on appeal the trial court's failure to give a proper corrupt and polluted source instruction.[17] The Commonwealth argues that Appellant was not prejudiced by counsel's failure in this regard because, considering the trial testimony, counsel's closing argument, and the court's instruction, the jury clearly understood they were to view Green's and Rucker's testimony with caution.

The PCRA court treated this claim solely as one of trial court error and did not consider the claim of counsel ineffectiveness. Although not responsive to Appellant's claim of counsel ineffectiveness, the PCRA court believed that even if Appellant was entitled to the corrupt and polluted source charge, he could not demonstrate that the charge would have changed the outcome of the trial. Specifically, examining the charge as a whole, rather than the isolated portion Appellant relied on, the PCRA court concluded that the trial court made clear in other portions of the jury charge that Green and Rucker were co-conspirators, and explained how to evaluate their credibility by emphasizing that the jury should consider

16. Appellant also argues that counsel was ineffective for failing to request an anti-corroboration instruction, which would have instructed the jury that "the testimony of one accomplice may not be used' to corroborate the testimony of another accomplice." Appellant, however, did not raise this issue in his PCRA petition, and it is, therefore, waived. Pa.R.A.P. 302(a) (claims cannot be raised for the first time on appeal).

17. Appellant also claims that the trial court erred by failing to instruct the jury adequately and consistently with the standard jury instruction for accomplice testimony. Because counsel objected to the charge, but declined to raise this issue on appeal, it is waived. 42 Pa.C.S. § 9544(b) (an allegation is waived "if the petitioner could have raised it but failed to do so before trial, at trial, on appeal or in a prior state post-conviction proceeding.").

each witness's motive and whether the witness was biased or interested in the outcome of the case.

We observe that Appellant is correct that the trial court's jury charge did not include the standard charge for accomplice testimony, commonly referred to as the corrupt and polluted source charge. As we explained in *Commonwealth v. Chmiel*, 536 Pa. 244, 639 A.2d 9, 13 (1994), "in any case where an accomplice implicates the defendant, the judge should tell the jury that the accomplice is a corrupt and polluted source whose testimony should be viewed with great caution." *See also Commonwealth v. Collins*, 598 Pa. 397, 957 A.2d 237 (2008). For an accomplice charge to be required, the facts need to permit an inference that the witness was an accomplice. *Chmiel*, 639 A.2d at 13; *Commonwealth v. Sisak*, 436 Pa. 262, 259 A.2d 428 (1969). "If the evidence is sufficient to present a jury question with respect to whether the prosecution's witness was an accomplice, the defendant is entitled to an instruction as to the weight to be given to that witness's testimony." *Chmiel*, 639 A.2d at 13; *Commonwealth v. Mouzon*, 456 Pa. 230, 318 A.2d 703 (1974).

To establish prejudice from counsel's failure to challenge the jury charge on appeal, Appellant must show that there is a reasonable probability that, but for counsel's error or omission, the result of the proceeding would have been different. *Commonwealth v. Colavita*, 993 A.2d 874, 887 (Pa.2010). Specifically, Appellant must demonstrate that if counsel had challenged the jury charge on appeal, there is a reasonable probability that this Court would have awarded him a new trial. Thus, we consider whether counsel's failure to challenge the jury charge in this respect on direct appeal so prejudiced Appellant that it had an adverse effect on the outcome of his appeal.

On direct appeal, our review of the jury charge would have required us to review the charge as a whole to determine whether it is fair or prejudicial. *Commonwealth v. Williams*, 602 Pa. 360, 980 A.2d 510, 523 (2009); *Commonwealth v. Robinson*, 583 Pa. 358, 877 A.2d 433, 444 (2005); *Common-*

*wealth v. Hawkins,* 567 Pa. 310, 787 A.2d 292, 301 (2001); *Zettlemoyer,* 454 A.2d at 952. "The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Williams,* 980 A.2d at 523 (quoting *Hawkins,* 787 A.2d at 301). There is error only when the trial court abuses its discretion or inaccurately states the law. *Id.; Commonwealth v. Markman,* 591 Pa. 249, 916 A.2d 586, 613 (2007).

The "corrupt source" charge in particular is designed specifically to address situations where one accomplice testifies against the other to obtain favorable treatment. It directs the jury to view the testimony of an accomplice with disfavor and accept it only with care and caution. Instead of the strong admonition to scrutinize carefully the testimony of Green and Rucker in accord with Pennsylvania Suggested Standard Jury Instruction (Criminal) (revised October 1981) Section 4.01, the jury was instructed that Green and Rucker were coconspirators allegedly in a conspiracy with Appellant who testified on behalf of the Commonwealth, and the jury should bear this in mind during their deliberations when assessing these witnesses' credibility. N.T. 2/1/1985 at 167.

As the PCRA court observed, however, this was not the trial court's sole instruction with regard to these witnesses's testimony. The trial court also instructed the jury to weigh, analyze, and judge the credibility and reliability of the witnesses, N.T. 2/1/1985 at 101, 109–10; to consider whether a witness had a motive to lie, *id.* at 112; to consider whether bias or prejudice entered into a witness's testimony, *id.;* and to consider whether the witness has an interest in the outcome of the trial that would color that witness's testimony, *id.* Examining the charge as a whole, the trial court made clear to the jury that Green and Rucker were co-conspirators and directed the jury how to evaluate their credibility in light of these considerations.

Additionally, as the Commonwealth further develops, during Green's and Rucker's respective testimony, the prosecutor asked them about their plea agreements, which reduced the

charges of first-degree murder to third-degree murder and conspiracy. Green testified that she believed her plea would limit her sentence to no more than ten to twenty years' imprisonment, and that the extent of her cooperation in Appellant's trial would be conveyed to the judge at her sentencing hearing. N.T. 1/28/1985 at 52–57, 63. Rucker testified that he would be sentenced to five to twenty years' imprisonment and that an unrelated aggravated assault charge would be dismissed because of his cooperation with the Commonwealth in Appellant's trial. N.T. 1/29/1985 at 33–36, 41–45, 63–69, 76–77; 1/30/1985, 94–96, 100–103. The chief of the District Attorney's Office homicide unit testified that both witnesses had agreed to plead guilty to third-degree murder and conspiracy in exchange for their testimony against Appellant.

In light of the totality of the jury charge and the evidence produced regarding Green's and Rucker's interest in testifying for the Commonwealth, Appellant cannot prevail on his ineffectiveness claim. He simply has not demonstrated that he would be able to prove that if counsel had challenged the jury charge on direct appeal, the result of his appeal would have been different. Therefore, Appellant has failed to plead sufficient prejudice to entitle him to relief.

## VII. Burden of Proof Charge

Appellant next claims counsel ineffectiveness with regard to the trial court's instruction on the burden of proof. Specifically, the trial court instructed the jury as follows: "The question for you to decide, ... is not which side produced the most evidence, but, instead, which evidence you believe." N.T. 2/1/1985 at 148. In this regard, Appellant argues that counsel was ineffective for not objecting to this instruction and not challenging this aspect of the jury charge on direct appeal for two reasons: (1) because the charge improperly imposed a burden on Appellant to produce evidence by implying that the prosecution must prevail unless Appellant produced some evidence for the jury to believe; and (2) because the charge relieved the Commonwealth of its burden to prove every element of the crimes charged beyond a

reasonable doubt by reducing the Commonwealth's burden to a preponderance of the evidence standard.[18]

The Commonwealth argues that the charge as a whole did not dilute its burden of proof. The PCRA court found that the portion of the charge quoted above was part of the discussion about evaluating the credibility of witnesses. In another portion of the charge, the trial court instructed the jury that the Commonwealth had the burden of proving Appellant guilty beyond a reasonable doubt. Examining the charge as a whole, the PCRA court rejected Appellant's claim.

█ The Due Process Clause emphatically protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). It is well-established that the defendant has no duty to present evidence and may instead rely on the presumption of innocence and the Commonwealth's burden of proof. *See, e.g., Commonwealth v. Collins,* 598 Pa. 397, 957 A.2d 237, 249 (2008); *Commonwealth v. Pounds,* 490 Pa. 621, 417 A.2d 597, 603 n. 17 (1980).

Viewing the charge as a whole, as we must, *see Commonwealth v. Smallwood,* 497 Pa. 476, 442 A.2d 222, 227 (1982), it is notable that, during the final instructions to the jury, the trial court charged the jury as follows:

It is not—let me say that again—it is not—N–O–T the defendant's burden to prove that he is innocent. Instead, it is the Commonwealth that always has the burden of proving each and every element of the crime charged and that the defendant is guilty of that crime beyond a reasonable doubt.

Now, although in this case the defendant did present witnesses on his own behalf and he did take the stand in his own defense, a person accused of a crime is not required to present evidence or to prove anything in his own defense.

18. Appellant also argues that this charge was trial court error. This claim is waived because Appellant did not object at trial. *See* 42 Pa.C.S. § 9544(b). The only viable claim is that counsel was ineffective for failing to object.

If the Commonwealth's evidence fails to meet its burden, then your verdict must be not guilty.

N.T. 2/1/1985 at 105–06. This charge properly instructed the jury that the Commonwealth was required to prove beyond a reasonable doubt every element of the crimes charged.

The single statement to which Appellant refers was made while the court was discussing the credibility of witnesses where their testimony conflicted. The trial court's instruction about witness credibility conformed to the standard jury instruction not to make a decision based on which side presented the greater number of witnesses or the greater amount of evidence. *See* Pennsylvania Suggested Standard Jury Instructions (Criminal) Section 7.04. We will not take the witness credibility portion of the charge and consider it to the exclusion of the proper reasonable doubt charge. Accordingly, this claim fails.

VIII. Accomplice and Co-conspirator Liability Instruction

▇▇▇ Next, Appellant argues that trial counsel was ineffective for failing to object to the trial court's accomplice and coconspirator. liability instructions as violative of due process because the instructions allowed the jury to find Appellant guilty of first-degree murder without proof beyond a reasonable doubt that he, rather than an accomplice or co-conspirator, had specific intent to kill. The trial court instructed as follows:

A defendant may by reason of being a member of a conspiracy become personally liable for a crime even though he did not personally commit it. You may find the defendant guilty of the crime of murder as a conspirator if you are satisfied beyond a reasonable doubt—first—that the defendant agreed with another person or persons that they or one of them would commit the crime of murder, or that the defendant would assist in the crime of murder; that the defendant did so with the intent of promoting or facilitating the commission of that crime and that while the agreement remained in effect the crime of murder was committed and

the crime of murder was committed in furtherance of the common design of the conspiracy.

Also, you may find the defendant guilty of a crime without finding that he personally engaged in the conduct required for the commission of that crime, or even that he was personally present when the crime was committed.

A defendant is guilty of a crime if he is an accomplice of another person who commits a crime, however a defendant does not become an accomplice by being present at the scene or by knowing about a crime or by knowing that a crime is about to be committed, he is an accomplice if with the intent of promoting or facilitating the commission of the crime he aids in its commission, or he attempts to aid in the commission, and, or, assists the person who actually commits the crime.

Now, you may find the defendant guilty or [sic] a crime on the theory that he was an accomplice as long as you are satisfied beyond a reasonable doubt that the crime was committed and that the defendant was an accomplice of the person who committed that crime.

N.T. 2/1/85 at 142–44.

According to Appellant, this co-conspirator liability instruction permitted a conviction of first-degree murder where the object of the conspiracy is something other than murder, and created the reasonable probability that the jury understood these instructions as allowing a first-degree murder conviction based on a general agreement to commit a crime. Further, according to Appellant, the accomplice liability instruction did not state that the jury must find the defendant an accomplice to the particular crime or explain that the defendant, as an accomplice, must have the specific intent to kill, and instead indicated that the jury could convict of first-degree murder if it believed Appellant was an accomplice to any crime. Appellant's claim, therefore, is that counsel was ineffective for failing to object to these instructions.[19]

19. Appellant's related claim of trial court error is waived because Appellant did not object to the jury charge in this respect at trial. 42 Pa.C.S. § 9544(b) ("For purposes of this subchapter, an issue is waived

The Commonwealth argues that Appellant's claim completely disregards that the evidence at trial established Appellant was the shooter. Therefore, according to the Commonwealth, although Appellant was also convicted of conspiracy, his murder conviction was not based on accomplice or co-conspirator liability. The PCRA court considered this claim frivolous, and held that the trial court's charge was proper.

The Commonwealth's argument that Appellant's conviction for first-degree murder was premised on his act of shooting the victim rather than on accomplice or co-conspirator liability is well-taken. Appellant's first-degree murder conviction was premised on the evidence of an intentional killing. Specifically, the evidence established that Appellant approached the victim from behind, shot him once, and, as the victim attempted to stand, shot him three more times. *Smith*, 540 A.2d at 248. Therefore, it was the act of shooting and killing the victim, rather than conspiring with others to commit this crime, that resulted in Appellant's murder conviction. Because Appellant's murder conviction was not based on accomplice or co-conspirator liability, there is no factual predicate to his argument that the trial court's instruction improperly permitted the jury to convict him as an accomplice or co-conspirator, and he cannot prevail on his claim that counsel was ineffective for failing to object to this charge.

## IX. Ineffectiveness of Trial Counsel

Appellant's next issue has three sub-parts, each premised on counsel's alleged ineffectiveness.

### A. Robert Easley stipulation

Appellant testified in his defense at trial that he was not with Green or Rucker on the night of the murder and was nowhere near the location of the shooting. He specifically testified that on the night of the murder, he did not attend a

if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding."). What remains is Appellant's claim that trial counsel was ineffective for failing to object to the charge.

party at the home of Robert Easley.[20] Following Appellant's testimony, counsel stipulated that if the Commonwealth called Easley in rebuttal, he would testify that he saw Appellant at his party. Appellant claims that the stipulation suggested Appellant lied during his sworn testimony and that counsel was ineffective for agreeing to it.

The Commonwealth argues that the stipulation about Easley was not an admission that Appellant was at Easley's party, but merely an agreement that Easley would testify that Appellant was there. The PCRA court rejected this claim, finding that the stipulation was not an admission to the truth of Easley's rebuttal testimony, and that counsel had a reasonable strategy to stipulate to Easley's testimony rather than have the Commonwealth produce him as a witness. Specifically, the PCRA court reasoned that entering into the stipulation limited the impact of Easley's testimony, because it prevented a live witness from testifying to Appellant's presence at a party which Appellant denied attending.

We agree with the Commonwealth and the PCRA court. Appellant has misconstrued the nature of the stipulation. It was not an admission that Appellant was at Easley's party and therefore lied during his testimony. Rather, it was an agreement that if the Commonwealth called Easley in rebuttal, he would testify that he saw Appellant at the party. The trial court explained to the jury that a stipulation was simply an agreement to incorporate the testimony of a witness who, if called, would testify to exactly what was being stipulated. There is no merit to Appellant's argument that counsel should not have agreed to the stipulation. Moreover, Appellant has not demonstrated that the outcome of the case would have been different if trial counsel had an opportunity to cross-examine Easley. *See Commonwealth v. Fletcher*, 604 Pa. 493, 986 A.2d 759, 789 (2009) (no ineffectiveness for agreeing to a

**20.** Apparently, presence at Easley's party could have connected Appellant to a gun on the evening of the murder. According to the Commonwealth, if trial counsel had questioned Easley about whether he recalled seeing Appellant at the party, Easley would have revealed that the basis of his recollection of seeing Appellant that night was that Appellant had shown him a gun during the party.

stipulation by medical examiner where the appellant failed to demonstrate that live testimony would have resulted in a different outcome).

### B. Expert testimony stipulation

During trial, the prosecutor offered a stipulation that a criminologist for the Philadelphia Police Department would have testified that lab reports revealed the presence of human blood and holes in the victim's clothing. The prosecutor also offered a stipulation based on ballistic evidence that the criminologist would testify that tests performed on these holes revealed that the distance between the victim and the gun was at least one foot. Counsel agreed to the stipulations. Appellant argues that counsel was ineffective for agreeing to the stipulations because they suggested to the jury that Appellant had personal knowledge of the crime scene and how the victim died.

The Commonwealth argues that this claim is frivolous because Appellant was not prejudiced by the stipulations. The PCRA court held that counsel's decision to agree to the stipulations was part of a reasonable strategy because it minimized the emotional impact this testimony could have had, and, additionally, that Appellant cannot demonstrate prejudice. *See Commonwealth v. Cheatham,* 419 Pa.Super. 603, 615 A.2d 802, 807 (1992) (counsel exercised reasonable trial strategy in stipulating to victims' injuries to lessen the emotional impact of the testimony).

We are not persuaded that Appellant was prejudiced because counsel agreed to these stipulations. *See Fletcher,* 986 A.2d at 789. This evidence did not place the defendant at the scene or contradict his defense. There was no dispute about the proximity of the shooter or whether the victim bled when shot. Accordingly, this clam fails.

### C. Cross-examination

Next, Appellant claims that counsel's cross-examination of several Commonwealth witnesses (Green, Rucker, and Harris) bolstered their credibility. According to Appellant,

counsel's attempt to impeach each of these witnesses with prior statements exculpating Appellant led the witnesses to indicate that they had lied in the past but were telling the truth at trial. Specifically, Appellant points to several portions of trial counsel's cross-examinations as faulty. First, with regard to Green:

Q: Now do you remember telling the police on June 23, 1979 that someone named June did the shooting?

A. Yes.

Q. And you described him as being a member of the Somerville gang . . . ?

A. Yes.

Q. You said you saw him with another dude; is that right?

A. Yes.

\* \* \*

Q. And all those statements were not true; isn't that correct?

A. Yes.

N.T. 1/28/1985 at 81. Second, with regard to Rucker:

Q. Do you remember hearing this question and making this response—(reading): "Question: Did Melvin Smith tell you he was going to kill Davis Kelly?" "Answer: No." Do you remember hearing that question, making that response?

A. Yes.

Q. That was not true.

A. No.

Q. And then—(reading): "Question: Did you see Melvin with a gun the night that Davis Kelly was killed?" "Answer: He did not show me no pistol." Do you remember hearing that question, making that response?

A. Yes.

Q. That was not true?

A. No.

N.T. 1/29/85 at 49. Finally, regarding Harris, who made a statement to police on June 23, 1979, that she had never seen the shooter before:

Q. That [June 23, 1979] answer was not the truth; was it?

A. No.

* * *

Q. Now, Ma'am, you were asked about the individual who was with the shooter, do you remember being asked by Detective McNesby about that person?

A. Yes.

Q. Do you remember being asked this question on page 5—(reading): "Question: What was the other person wearing; describe him?" "Answer: He had on a white tee shirt, blue overalls." "Question: Do you recognize this male?" "Answer: No." Do you recognize—

A. Yes.

Q. That is not true; is it?

A. No.

Q. You, in fact, did know Levi Rucker.

A. Yes.

* * *

Q. [Regarding a statement Harris made to police on July 7, 1979]: At that time did you tell Detective Fry that you knew [the shooter] was James Melvin Smith?

A. No, I didn't.

Q. But you in fact did know who it was.

A. I did.

N.T. 1/29/85 at 146–49. According to Appellant, in each of these instances trial counsel violated the cardinal rule of cross-examination never to ask the witness to explain the inconsistency of a prior statement.

The Commonwealth argues that in each instance, trial counsel emphasized to the jury that the witnesses were liars. The Commonwealth also notes that trial counsel likely asked these questions in a sarcastic tone, implying to the jury that, having

lied in the past, their claims that they were telling the truth at trial were not believable. The PCRA court rejected this claim, reasoning that trial tactics pertaining to cross-examination are matters of strategy that are within the province of counsel. *See Commonwealth v. Smolko*, 446 Pa.Super. 156, 666 A.2d 672, 680 (1985).

As we have explained, testimony which the defendant believes was not helpful by hindsight does not lay the groundwork for an allegation of ineffectiveness. *Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251, 1265 (1994); *Commonwealth v. Ly*, 528 Pa. 523, 599 A.2d 613 (1991). Matters concerning the examination and cross-examination of witnesses are matters clearly within the province of trial counsel. *Commonwealth v. Witherspoon*, 481 Pa. 321, 392 A.2d 1313, 1315 (1978); *see also* A.B.A. Standards Relating to the Prosecution's Function and the Defense's Function, § 5.2(b) (1971) (the decision on what witnesses to call, whether and how to conduct cross-examination ... and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his client); *Commonwealth v. McGrogan*, 449 Pa. 584, 297 A.2d 456 (1972) ("[C]ertain decisions during trial are within the exclusive province of counsel."). However, "[t]he right to representation by counsel to be meaningful necessarily includes the right to effective representation." *Witherspoon*, 392 A.2d at 1315; *Commonwealth v. Wideman*, 453 Pa. 119, 306 A.2d 894, 896 (1973). The examination into the effectiveness of counsel does not turn on whether other alternatives were more reasonable, employing a hindsight evaluation of the record. *Witherspoon*, 392 A.2d at 1315; *Commonwealth v. Roundtree*, 469 Pa. 241, 364 A.2d 1359, 1362 (1976).

Trial counsel's cross-examination of these Commonwealth witnesses elicited their prior inconsistent statements and questioned the veracity of their trial testimony given these prior inconsistencies. Trial counsel succeeded in impeaching these witnesses and portraying them as liars. We are not persuaded that if counsel had chosen some other course of cross-examination that there is a reasonable probability that

the outcome of trial would have been different. *See Commonwealth v. Smith*, 544 Pa. 219, 675 A.2d 1221, 1231 (1996) (rejecting claim of ineffectiveness premised on cross-examination of Commonwealth witnesses where counsel elicited contradictory testimony from the witnesses); *Commonwealth v. Manigault*, 501 Pa. 506, 462 A.2d 239, 242 (1983) (rejecting ineffectiveness claim that examination of witnesses harmed rather than helped the appellant's case where counsel successfully impeached the witnesses). Appellant's claim of counsel ineffectiveness, therefore, does not entitle him to relief.

## X. Prior Bad Acts

■ Appellant's penultimate group of issues involves evidence of his prior bad acts. As background, Appellant's sister Barbara testified for the defense to establish a motive for Green falsely to implicate Appellant. Specifically, Barbara testified that she had been in a romantic relationship with Green when Appellant discovered Green and Barbara in bed together. He reacted violently: he "grabbed [Green], beat her up and told her not to come to the house anymore." N.T. 1/31/1985 at 5.

During cross-examination the prosecutor read from an affidavit Barbara had signed at an earlier date that provided more detail: "My brother, [Appellant], called Kim a bitch and started beating Kim up. Kim fought back, but my brother was too strong for her. [Appellant] knocked Kim on the floor and kicked her in the head and back and started to choke her." *Id.* at 38–39. Counsel objected, and the trial court overruled the objection. The prosecutor continued reading from the affidavit: "I had to stop my brother from choking Kim to death by grabbing his arms. Then [Appellant] dragged Kim down the steps of our house and threw her on the ground in front of our house outside. [Appellant] then told Kim that she was lucky, but if he sees her again messing with his sister he was going to kill her." N.T. 1/31/1985 at 39–40. According to the affidavit, Green responded by saying that it was not the last time Appellant would see or hear from her. *Id.* The prosecutor asked Barbara if that was her exact

language, to which she replied that it was, and the prosecutor queried "Are you telling us that your brother was capable of that violence?" *Id.* at 40. Counsel objected, the trial court sustained the objection, and the witness did not answer. In closing, the prosecutor read the same passage of Barbara's affidavit (hereafter, this affidavit will be referred to as "the affidavit evidence"). Counsel objected, and the trial court noted the objection. Counsel did not request a limiting instruction, and the trial court did not provide one.

Before addressing the claims that are properly before us, we must dispose of the claims that are clearly waived. Specifically, Appellant raises several related waived claims. First, Appellant argues that the trial court erred when it admitted the affidavit evidence during Barbara's cross-examination over counsel's objection. Because trial counsel objected to the admission of the affidavit evidence, but did not challenge the admission of this evidence on appeal, this claim is waived. 42 Pa.C.S. § 9544(b) (an allegation is waived "if the petitioner could have raised it but failed to do so before trial, at trial, on appeal or in a prior state post-conviction proceeding."). Second, Appellant argues that the trial court erred because it did not give a limiting instruction about how the jury should consider the affidavit evidence. Because trial counsel did not request a limiting instruction, this claim of trial court error is also waived. *Id.* Third, Appellant argues that the prosecutor engaged in prosecutorial misconduct during closing arguments when he referred back to the affidavit evidence. Because trial counsel objected to the prosecutor's closing argument but did not raise this issue on appeal, it is waived. *Id.* Fourth, Appellant argues that the trial court erred for failing to sustain counsel's objection during the prosecutor's closing. This claim is waived because counsel did not pursue it on appeal. *Id.* Fifth, Appellant argues that counsel was ineffective for failing to request a limiting instruction regarding how the jury should receive the affidavit evidence. He did not, however, raise this claim in his PCRA petition, and it is, therefore, waived. *See* Pa.R.A.P. 302(a).

What remains are Appellant's assertions that because, according to Appellant, the affidavit evidence was inadmissible, counsel was ineffective in two respects: first, for failing to move to strike the affidavit evidence; and, second, failing to raise these issues on appeal. Appellant does not specify which issues trial counsel should have raised on appeal. Notably, Appellant does not argue that trial counsel was ineffective for his direct examination of Barbara, in which evidence of Appellant's altercation with Green was introduced.

The Commonwealth and the PCRA court considered Appellant's arguments based on the affidavit evidence to be one claim. The Commonwealth argues that the claim arising from the affidavit evidence is meritless because Barbara testified for the defense that when Appellant discovered her engaging in sexual activity with Green, he reacted violently. The PCRA court similarly concluded that the affidavit evidence was admissible because defense counsel opened the door to it by bringing out on direct examination the nature of Appellant's prior altercation with Green.

Addressing Appellant's claims that trial counsel was ineffective for failing to prohibit the Commonwealth's use of the affidavit evidence and for failing to appeal directly therefrom, we observe that we can dispose of these contentions together. All claims rise and fall on the admissibility of the affidavit evidence. If the evidence was admissible, there is no merit to Appellant's contention that counsel was ineffective for failing to object during closing or failure to raise the issue on appeal.

The record reveals that the purpose of trial counsel's direct examination of Barbara was to elicit testimony establishing Green's motive falsely to implicate Appellant. Trial counsel succeeded in establishing Green's motive when he obtained Barbara's testimony that when Appellant discovered her relationship with Green, he grabbed Green, beat her up, and told her not to come to the house anymore, and that Green, in response, promised that it was not the last time Appellant would see or hear of her. In furtherance of this direct examination by the defense, the prosecutor questioned Barbara with the affidavit in which she provided a more detailed

account of Appellant's violent treatment of Green. The prosecutor's inquiry on this matter was in furtherance of Appellant's own direct examination of Barbara that the reason Green had a motive to lie was because of a history of animosity between Green and Appellant. Having "opened the door" to the fact of an altercation, Appellant cannot complain that the Commonwealth chose to explore further what was behind that door. *See Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221 (1995) (where defendant opens the evidentiary door to his past criminal conduct, the Commonwealth may cross-examine on this point); *Commonwealth v. Ford*, 539 Pa. 85, 650 A.2d 433, 443 (1994) (defendant's prior criminal record is not admissible as evidence but if defendant opens an evidentiary door concerning his past criminal record, then Commonwealth is allowed to cross-examine on that issue); *see. also Commonwealth v. Reed*, 605 Pa. 431, 990 A.2d 1158, 1170 (2010) (trial courts maintain discretionary control over the questioning of witnesses, subject to review for abuses); *Commonwealth v. Lopinson*, 427 Pa. 284, 234 A.2d 552, 556 (1967) (a court must allow great latitude as to the scope of cross-examination). Because the evidence Appellant now claims was inadmissible was admissible because Appellant opened the door, and the trial court, within its discretion, permitted the prosecutor's cross-examination, there is no basis for his assertion that trial counsel was ineffective for failing to move to strike. Likewise, because the evidence was admissible, there is no merit to Appellant's contention that counsel was ineffective for failing to challenge on appeal any issue that involved the admissibility of this evidence. Consequently, Appellant's present assertions fail for a lack of merit.

## XI. Cumulative Error

Finally, Appellant argues that he is entitled to relief because the cumulative effect of these purported errors was to deny him a fair trial, effective assistance of counsel, and the heightened procedural safeguards constitutionally required in capital cases. The only claims we have resolved solely on prejudice grounds are the claims regarding the accomplice witness charge, trial counsel's stipulations regarding expert

testimony, and trial counsel's cross-examination of Commonwealth witnesses. These claims alone do not warrant relief; nor do they together warrant relief. The notion of cumulating prejudice does not flow from our disposition of these disparate claims. *See Commonwealth v. Lesko,* J–70–2008, Slip Op. at 104 (pending) (prejudice does not accumulate from two disparate claims). Considering these claims together, we conclude that the outcome of the trial or appeal would have been the same. Accordingly, this claim fails.

## Conclusion

For the foregoing reasons, we affirm the order of the PCRA court.[21]

Chief Justice CASTILLE and Justices EAKIN, TODD, McCAFFERY, ORIE MELVIN join the opinion.

Justice SAYLOR files a dissenting opinion.

Justice SAYLOR, dissenting.

This case reflects multiple irregularities, which are far too prevalent in the capital post-conviction arena. The matter has languished in the PCRA court for the better part of two decades. Several attorneys who have represented Appellant on post-conviction did very little or nothing to advance the case. *See* Majority Opinion, at 619–20, 17 A.3d at 880–81. After the Defender Association of Philadelphia entered their appearance, the PCRA court attempted to dismiss the amended petition in a perfunctory fashion, yielding a remand. *See id.* at 621, 17 A.3d at 881. Such dismissal was obviously unjustified, as, in the ensuing proceedings—albeit five years later—the Commonwealth stipulated to penalty relief based on deficient performance by Appellant's trial counsel. *See id.* at 621–22, 17 A.3d at 882. Presently, we are confronted with an incomplete PCRA court opinion after a second summary dis-

21. The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).

missal of guilt-phase claims. *See id.* at 624–25, 17 A.3d at 883–84.

This Court has spoken of a "considerable degree of discretion afforded to PCRA courts in disposing of collateral petitions under the PCRA." Given the unconscionable delay, disarray, and inconsistencies we are seeing in these cases, I fail to see how this sort of generalized deference can be justified any longer.

I have observed on previous occasions that "the Court would give better effect to the values of regularity and fairness that are essential to the judicial function by requiring closer and more consistent adherence to the procedures that have been designed to ensure the reliability of criminal convictions, particularly in the capital arena, where the need for reliability is at its greatest." *Commonwealth v. Bryant,* 579 Pa. 119, 164, 855 A.2d 726, 752 (2004) (Saylor, J., dissenting); *accord Commonwealth v. Carson,* 590 Pa. 501, 617, 913 A.2d 220, 288–89 (2006) (Saylor, J., concurring and dissenting). In light of the many instances in which my comments have gone unobserved by the Court at large, I have attempted to abide by the majority position that the courts may make some cold-record credibility determinations. *See, e.g., Commonwealth v. Small,* 602 Pa. 425, 484–85, 980 A.2d 549, 584–85 (2009) (Saylor, J., concurring). To my knowledge, however, no workable standard has been announced to guide the courts in the evenhanded dispensation of such decisions, and the affordance of "considerable discretion" yields far too much room for inconsistent treatment depending on the predilections of individual jurists. *Commonwealth v. Williams,* 602 Pa. 360, 401, 980 A.2d 510, 535 (2009) (Saylor, J., dissenting) ("The alternative [to a consistent approach on this Court's part] is that the availability of hearings in post-conviction matters will depend on different judges' individual thresholds for making credibility assessments without actually hearing the witnesses, and thus, the administration of justice will be uneven."). Moreover, at some point, as we continue to see the unjust mismanagement, or non-management, of these cases—with twenty years on state post-conviction being simply incomprehensible—there merely comes a breaking point.

In my view, the Court must require uniform, strict adherence to the requirements of pre-dismissal notice containing reasonably specific notice of pleading deficiencies or other reasons for summary dismissal and uniformly dispense hearings where credibility matters are materially in issue. *See* Pa.R.Crim.P. 909(B).[1] It is also apparent that we need better enforcement of the time track established in our criminal procedural rules. *See id.* This case, and the many others like it, demonstrates the need for immediate reform.

As I believe Appellant was entitled to an evidentiary hearing, I respectfully dissent in favor of a remand for a prompt hearing and essential fact-finding by the PCRA court.

1. Addressing claims in the absence of fact-finding fosters appellate-level superficialities and incongruities. For example, in the present case, the majority explains that a recantation declaration provided by eyewitness Betty Harris cannot be after-discovered evidence, because counsel could have learned of the information by interviewing her prior to trial. *See* Majority Opinion, *Op.* at 628–30, 17 A.3d at 886–87. Nevertheless, in addressing the claim that trial counsel was ineffective for failing to interview Ms. Harris, the majority reasons that waiting until trial gave Ms. Harris "every opportunity" to provide the information. *Id.* at 633, 17 A.3d at 889. In addition to the facial tension between these two dispositions, this Court generally recognizes that an adequate *pre*-trial investigation is a prerequisite to a reasonable strategy. *See, e.g., Commonwealth v. Malloy*, 579 Pa. 425, 454, 856 A.2d 767, 784 (2004). Moreover, the duty to investigate may include a duty to interview key witnesses. *See, e.g., Commonwealth v. Johnson*, 600 Pa. 329, 351, 966 A.2d 523, 535–36 (2009). Therefore, I find it difficult to accept the majority's present proposition that an attorney can curtail a defense guilt-phase, pre-trial investigation merely because he will have the ability to confront key witnesses in the trial proceedings.

The alleged lack of an adequate pre-trial, guilt-phase investigation is also particularly troublesome where, as here, the Commonwealth is stipulating that counsel rendered deficient stewardship relative to the other critical phase of the trial.