J-S49026-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| GREGORY SMITH | |
| Appellant | No. 1767 WDA 2016 |

Appeal from the PCRA Order Dated October 25, 2016
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0015978-2012

BEFORE: DUBOW, J., SOLANO, J., and FITZGERALD, J.[*]

MEMORANDUM BY SOLANO, J.: **FILED NOVEMBER 15, 2017**

*Pro se* Appellant Gregory Smith appeals from the order dismissing his first Post Conviction Relief Act ("PCRA")[1] petition. We affirm.

We state the facts and procedural history as set forth by a prior panel of this Court, which resolved Appellant's direct appeal:

> The evidence adduced at trial was based heavily on the testimony of James Upshaw. Mr. Upshaw testified that he was a friend of the victim, Jacquae Pascal. Mr. Upshaw testified that, on July 6, 2012, he had made plans to meet Mr. Pascal at the Team Mozzi barbershop in the Hill District area of the City of Pittsburgh to get haircuts together. Mr. Upshaw explained that July 6th was Mr. Pascal's birthday and they were going to hang out for a period of time on that day. Mr. Upshaw testified that he brought his four year-old son along to get a haircut. Mr. Upshaw, his son and Mr. Pascal met at the barbershop to get

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541-9546.

haircuts. When Mr. Upshaw arrived at the barbershop, there were others in the barbershop waiting to get a haircut. Most of the customers were discussing basketball. [Appellant] was in the barber's chair. Mr. Upshaw testified that he had known [Appellant] for a number of years.

Mr. Upshaw testified that [Appellant] got his haircut and left the barbershop. Mr. Upshaw was under the impression that [Appellant] left to go to his girlfriend's house. [Appellant] shortly returned and remained outside the barbershop. While Mr. Upshaw and his son were waiting their turn for a haircut, Mr. Upshaw's son advised Mr. Upshaw that he was thirsty and asked if he could get some water due to the hot temperatures inside the barbershop. Mr. Upshaw agreed to purchase a bottle of water for his son. Mr. Pascal indicated he would go with Mr. Upshaw and his son to get something to drink. The three of them left the barbershop and crossed the street on their way to "Juan's", a local convenience store. As they crossed the street, Mr. Upshaw saw [Appellant] come up behind the victim and shoot him multiple times with a chrome revolver. Mr. Upshaw testified he screamed at [Appellant] and asked him "why would you do this, what is wrong with you?"

Immediately after the shooting, Mr. Upshaw saw [Appellant] run into his girlfriend's residence. At that point, Mr. Upshaw left the scene with his son and went to his mother's house. He called Mr. Pascal's girlfriend and told her what happened. He did not, however, inform the police what happened at that time. Because [Appellant] was not in custody, Mr. Upshaw feared for his safety and kept what he knew to himself. For some time, he did not contact the police about what occurred. He later agreed to provide details of the shooting but only after his family was placed into the witness protection program.

City of Pittsburgh Police Officer Matthew O'Brien responded to the scene. The shooting occurred near the intersection of Center Avenue and Kirkpatrick Street at approximately 2:00 p.m. Upon arriving at the scene, he canvassed the area attempting to locate any witnesses to the shooting. Despite the presence of many people at the scene, nobody was willing to discuss the shooting with him. There were no bullet casings found at the scene. The absence of casings was consistent with use of a revolver to commit the shooting.

Homicide detectives were dispatched to the scene. Through the course of their investigation, they were informed that a person known on the street as "Pretty" may have been responsible for the shooting. It was learned that [Appellant]'s nickname was "Pretty". Detectives then sent out word within the police department that they were looking for [Appellant].

Later in the evening, on the night of the shooting, Pittsburgh Police Officers pulled over a vehicle in the South Side section of the City of Pittsburgh that was involved in a hit and run. [Appellant] was inside the vehicle when the responding officers stopped the vehicle. When the officers identified [Appellant], they contacted homicide detectives to advise that they had [Appellant] in custody.

Homicide detective Thomas Leheny interviewed [Appellant] on the night of the shooting. Detective Leheny informed [Appellant] that he did not have to speak with the detectives. Detective Leheny did advise [Appellant] that he was not under arrest. [Appellant] agreed to speak with Detective Leheny. [Appellant] told Detective Leheny that prior to the shooting he was with a girl in the West End of Pittsburgh at the time of the shooting. [Appellant], however, could not provide a name or phone number for the girl nor could he provide an address for the girl.

[Appellant] then told Detective Leheny that he was driving through the Hill District talking on his cell phone when the murder occurred. Detective Leheny had not advised [Appellant] where the murder occurred. [Appellant] verbally consented to a gunshot residue test of his clothing. Detectives obtained [Appellant]'s t-shirt for processing. Testing confirmed that gunshot residue was present on the front of the t-shirt. After this was done, Detective Leheny continued to speak with [Appellant]. At this point, [Appellant] put his head down and told Detective Leheny that he "wasn't right in the head" and he was prone to sudden bursts of anger since he was a kid. [Appellant] told Detective Leheny that he didn't want to talk anymore and asked if he was free to leave. [Appellant] then left the police station.

An arrest warrant was issued for [Appellant] on August 30, 2012. [Appellant] could not be located. Officer Matthew

McCarthy testified that he was on patrol on November 7, 2013 when he conducted a traffic stop of a vehicle driven by Johnny Rutherford for speeding. Once the vehicle was pulled over, the front seat passenger, [Appellant]'s brother, quickly exited the vehicle. [Appellant], who was the back seat passenger, attempted to get out of the vehicle by climbing over the front passenger seat. Officers quickly secured the vehicle. Upon being asked for identification, [Appellant] gave a false name and date of birth. He provided an age that was not possible based on the date of birth he provided. Because of his false answers, he was placed into custody. [Appellant] was subsequently identified and arrested for the homicide of Mr. Pascal.

Amber Traylor testified that she was driving in the area. As she was driving on Kirkpatrick Street, she heard loud noises. She observed the shooting in her rearview mirror. She saw three people standing outside the barbershop and she saw another person shooting at a person lying on the street. She was not able to provide detailed descriptions of any of the persons she observed at the scene of the shooting.

The medical examiner testified in this case that the cause of Mr. Pascal's death was multiple gunshot wounds to his trunk and extremities. The manner of death was homicide. Mr. Pascal suffered six total gunshot wounds. Three of the gunshot wounds were to his back. The first wound entered the middle of his back and pierced his pulmonary vein and the heart. Mr. Pascal sustained other gunshot wounds to his buttocks, his right shoulder, his right upper arm and to the back of his hand.

*Commonwealth v. Smith*, 2015 WL 6675474, at *1-*3 (Pa. Super., Aug. 21, 2015) (internal ellipses, brackets, formatting, citations, and footnotes omitted), *appeal denied*, 128 A.3d 220 (Pa., Dec. 16, 2015).

Appellant was charged by information, as follows:

The actor intentionally, knowingly, recklessly or negligently caused the death of Jaquae Pascal another human being, in violation of Section 2501 (a) of the Pennsylvania Crimes Code, Act of December 6, 1972, 18 Pa. C.S. §2501(a), as amended.

- 4 -

Crim. Information, 7/6/12. Our prior opinion discussed the subsequent procedural history:

> Following his arrest, on February 11, 2013, [Appellant] filed a motion to suppress physical evidence and statements, arguing, *inter alia*, that the police conducted a custodial interrogation in the absence of **Miranda** warnings and he did not consent to speak with the officers or to submit to a gun-shot residue test. A suppression hearing was held on April 29, 2013. On August 20, 2013, the court denied [Appellant's] motion to suppress with respect to the physical evidence, and granted in part and denied in part his motion as to his statements.
>
> [Appellant's] first jury trial was held September 30, 2013 to October 3, 2013, but ended in a mistrial. His second jury trial began on January 13, 2014. Two days later, the jury convicted [Appellant] of first-degree murder. The court then sentenced [Appellant] to life imprisonment without the possibility of parole for the murder conviction. On January 27, 2014, [Appellant] filed a post-sentence motion challenging the weight of the evidence and requesting a new trial. The court denied his motion on February 20, 2014.

**Smith**, 2015 WL 6675474, at *3 (footnotes omitted). This Court affirmed, and our Supreme Court denied Appellant's petition for allowance of appeal on December 16, 2015.

The PCRA court docketed Appellant's first PCRA petition on June 4, 2016. His petition raised, among other issues, a **Batson**[2] claim. The PCRA court appointed counsel, who filed a petition to withdraw contending that

---

[2] **Batson v. Kentucky**, 476 U.S. 79 (1986). "In **Batson**, the United States Supreme Court reiterated that a defendant is denied equal protection of the law when the government 'puts him on trial before a jury from which members of his race have been purposefully excluded.'" **Commonwealth v. Jones**, 951 A.2d 294, 298-99 (Pa. 2008) (citation omitted).

Appellant's ***Batson*** claim, among other issues, lacked merit. On October 4, 2016, the court issued an order that simultaneously granted counsel's petition to withdraw and notified Appellant of the court's intention to dismiss his PCRA petition pursuant to Pa.R.Crim.P. 907.

According to the PCRA court, Appellant filed an objection to counsel's petition to withdraw, which raised three claims: (1) the information was defective because it contained only a general charge of homicide; (2) the court violated the sentencing code by sentencing him to life imprisonment without parole; and (3) trial counsel was ineffective for not raising a ***Batson*** claim during jury selection. PCRA Ct. Op., 1/17/17, at 2. Appellant's objection, however, is not in the certified record transmitted to this Court.

The PCRA court dismissed Appellant's petition on October 25, 2016, and Appellant timely appealed, raising the following issues, which we set forth verbatim:

> 1. Was Appellant's bill of information-indictment, facially defective pursuant to Pa. Rule of Criminal Procedure 560(B)(5)?
>
> 2. Did the trial court err in proceeding to trial upon a defective information?
>
> 3. Did the trial court pronounce judgment and sentence upon Appellant on a specific crimes code violation not contained in the bill of information?
>
> 4. Did the trial court order the bill of information offense originally charged to be amended, after the imposition of sentence?
>
> 5. Did the trial court deviate from sentencing procedures set out in the sentencing code at 42 Pa.C.S. sub. sec. 9711?

6. Whether or not the state or defense didn't object to proceeding with immediate sentencing, what authority did the court have from deviating from sentencing procedure set out for first degree murder at 42 Pa.C.S. sub. sec. 9711, and if this was not a death qualified case, what authority is stated in said procedure at 42 Pa.C.S. sub. sec. §9711, that permits automatic imposition of sentence of life without parole?

7. Sentencing procedures for conviction of first degree murder, under statutory law, at 42 Pa.C.S. sub. sec. 9711, are only for death qualified and pursued cases, what other statute authorizes mandatory life without parole for a conviction of first degree murder, 18 Pa.C.S. sub. sec. 1102(a)(i), and if no other statute exists, how was defendant's jury instructed on first degree murder when it was not a death penalty case, and no statutory penalty exists for the court to access for imposition of any sentence thereafter, under statutory law?

8. P.C.R.A. counsel did not meet individual *Finley* requisites to show no pattern of exclusion of prospective jurors county-wide, as alleged, but merely spoke with trial counsel whom believed a *Batson* claim didn't occur and took her on her word, and showed no individual investigation steps per *Finley*?

Appellant's Brief at iii-iv.

"Preliminarily, we recognize that in reviewing the propriety of an order granting or denying PCRA relief, this Court is limited to ascertaining whether the evidence supports the determination of the PCRA court and whether the ruling is free of legal error." *Commonwealth v. Andrews*, 158 A.3d 1260, 1262-63 (Pa. Super. 2017).

Appellant's first four issues concern an allegedly defective information. He argues that the information lacked sufficient specificity and thus gave the Commonwealth free reign to pursue any degree of homicide. For his next three issues, Appellant argues that the court lacked authority to impose a

sentence of mandatory life imprisonment without parole. Because Appellant's brief does not present an argument regarding his last issue, we conclude Appellant has waived it. *See Commonwealth v. Phillips*, 141 A.3d 512, 522 (Pa. Super.), *appeal denied*, 161 A.3d 796 (Pa. 2016).

We need not address whether any of Appellant's issues are cognizable under the PCRA, or whether Appellant actually filed a response in opposition to the Rule 907 notice, because none of his issues have merit. After careful review of the parties' briefs, the record, and the decision of the Honorable Anthony M. Mariani, we affirm on the basis of the PCRA court's decision. PCRA Ct. Op. at 3-4 (holding an information charging criminal homicide sufficiently placed Appellant on notice, and that for a conviction for first-degree murder, mandatory sentence of life imprisonment without parole was required by 18 Pa.C.S. § 1102(a)). Because the PCRA court did not err, we affirm the order dismissing Appellant's first PCRA petition. The parties are instructed to attach a copy of the PCRA court's decision to any pleadings that reference it.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/15/2017

- 8 -

# Allegheny County - Department of Court Records
## Criminal Division - Filings Information

**County caseID:CP-02-CR-0015978-2012 (OPINION)**
**Case Description: COMMONWEALTH OF PENNSYLVANIA v. SMITH**
**Official Docket Entry, Sort By Document Number Ascending**

| Document Number | Title/Entry | Filing Date |
|---|---|---|
| 1 | OPINION | 01/17/2017 |

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA )
)
vs. ) CC No. 2008-15978
)
GREGORY SMITH, )
)
Petitioner. )
)
)

## OPINION

Mariani, J.

After a jury trial, the defendant was found guilty of first degree murder. He was sentenced to a mandatory term of life imprisonment. He filed a direct appeal and on August 21, 2015 the Superior Court at No. 451 WDA 2014 affirmed the judgment of sentence. A Petition for Allowance of Appeal was denied on December 16, 2015. On June 4, 2016, Petitioner filed a pro se petition pursuant to the Post-Conviction Relief Act (hereinafter referred to as "PCRA"), 42 Pa.C.S. § 9541, *et seq* . This Court appointed counsel, Scott Coffey, to represent the petitioner relative to that filing. Appointed counsel then filed a Turner/Finley [1] "No-Merit Letter" advising the Court that he had

---

[1] Commonwealth v. Turner, 518 Pa. 491, 544 A.2d 927 (Pa. 1988); Commonwealth v. Finley, 550 A.2d 213 (Pa. Super. 1988) (*En Banc*). When PCRA counsel seeks to withdraw, he must first file a Turner/Finley "no merit" letter with the court, stating that after a review of the record, all of the issues that the petitioner desires to raise have no merit. Commonwealth v. Smith, 700 A.2d 1301, 1304 (Pa. Super. 1997). "Arguing against one's client's position is not only permissible under Finley, it is required." Id. "The independent review necessary to secure a withdrawal request by counsel requires proof that: 1) PCRA counsel, in a "no-merit" letter, has detailed the nature and the extent of his review; 2) PCRA counsel, in the "no-merit" letter, lists each issue the petitioner wishes to have reviewed; 3) PCRA counsel must explain, in the "no-merit" letter, why petitioner's issues are meritless; 4) The PCRA court must conduct its own independent review of the record; and 5) The PCRA court must agree with counsel that the petition is meritless." Commonwealth v. Pitts, 981 A.2d 875 (Pa. 2009).

undertaken a thorough review of record and he believed the issues raised by Petitioner had no merit. He sought to withdraw his appearance on behalf of Petitioner.

This Court then determined that there were no meritorious issues to be raised in the PCRA. This Court considered the Turner/Finley No-Merit Letter filed in this case and this Court undertook its own independent consideration of the record. Having done that, this Court then issued a notice of its intention to dismiss the PCRA petition on October 4, 2016 and it granted appointed counsel's request to withdraw. Petitioner then filed an Objection to Counsel's No Merit Letter challenging the fact that the information filed in this case was defective because it only contained a general charge of homicide, that this Court violated the sentencing code by sentencing him to a term of imprisonment of life without parole for First Degree Murder and that trial counsel was ineffective for failing to raise a Batson claim during jury selection. This Court subsequently denied Petitioner's PCRA petition on October 25, 2016. Petitioner filed a timely Notice of Appeal.

On November 18, 2016, Petitioner filed Petitioner's Statement of Matters Complained of on Appeal Pursuant to R.A.P. 1925(b) raising the same claims of error he raised in his response to appointed counsel's no merit letter.

Petitioner first claims that the information filed against him was defective for a number of reasons but chief among them is that the charge as set forth in the Information did not provide notice as to what he was actually being charged with. The trial court

2

record establishes that the information filed in this case specifically charged Petitioner

with

> intentionally, knowingly, recklessly or negligently caused the death of Jaquae Pascal, another human being, in violation of section 2501(a) of the Pennsylvania Crimes Code, Act of December 6, 1972, 18 PA. C.S.A. §2501(a), as amended.

The actual crime of criminal homicide, found at 18 Pa. C.S.A. §2501(a), states

> A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being.

Petitioner's claim is clearly without merit. As set forth in <u>Commonwealth v. McMullen</u>,

616 A.2d 14, 16 (Pa.Super. 1992)[2], a charge of criminal homicide is sufficient to put a

defendant on notice of the crimes with which he or she is charged:

> A criminal information must inform the defendant of the crime with which he is charged and must be read in a common sense manner. <u>Commonwealth v. Badman</u>, 398 Pa.Super. 315, 580 A.2d 1367 (1990). An information will be regarded as sufficient in law provided it serves to notify the accused of the charges filed against him. <u>Commonwealth v. Williams</u>, 323 Pa.Super. 512, 470 A.2d 1376 (1984). "[T]he several types of homicide, namely, murder of any of the three named degrees and voluntary and involuntary manslaughter are constituent subsidiary offenses within the single major offense [of criminal homicide.]" <u>Commonwealth v. Polimeni</u>, 474 Pa. 430, 378 A.2d 1189 (1977). In <u>Badman</u>, *supra*, the court found the language did "kill or take part in the killing" of the victim was sufficient to put the defendant on notice of the crime with which he was charged. Id. at 324, 580 A.2d at 1371. Contrary to appellant's contention, we find <u>Badman</u> lends support to the trial court's finding the information adequately advised appellant of the crime with which he

---

[2] McMullen was subsequently reversed by the Pennsylvania Supreme Court on a basis unrelated to the notice issue.

3

was charged. See Commonwealth v. Taraschi, 327 Pa.Super. 179, 475 A.2d 744 (1984) (informations are sufficient where crimes charged are substantially in the language of the statute). We find the information alleging criminal homicide clearly notified appellant he was being charged with the death of Barcelona and advised him of the crimes which he was compelled to defend.

Petitioner also claims generally that his sentence of life imprisonment without parole was illegal because this Court did not follow proper sentencing procedures. Petitioner does not explain the basis for his challenge. Regardless of this omission, defendant was convicted of first degree murder and a mandatory sentence of life imprisonment without paroled was required. See 18 Pa.C.S.A. §1102(a). This issue is baseless.

Petitioner's final claim is that trial counsel rendered ineffective assistance of counsel for failing to raise a Batson challenge during jury selection because, according to Petitioner, there was a pattern of exclusion of African-American jurors from his jury pool.[3] In Commonwealth v. Smith, 17 A.3d 873 (Pa. 2011), the Supreme Court explained

> [I]n Commonwealth v. Uderra, 580 Pa. 492, 862 A.2d 74, 86 (2004), we held that in cases on collateral review like the one before us, where no Batson challenge was raised during *voir dire* and the only viable claim is one of counsel ineffectiveness for failing to raise a Batson objection during *voir dire*, the post-conviction petitioner may not rely on Batson's burden-shifting formula, but instead bears the burden in the first instance and throughout of establishing actual, purposeful discrimination by a preponderance of the evidence.

---

[3] See Batson v. Kentucky, 476 U.S.79 (1986)

4

This Court has reviewed the entire record in this case and agrees with appointed counsel that there is no evidence that the Commonwealth engaged in actual, purposeful discrimination during jury selection. There is no evidence that any juror was stricken based on race or that the jury pool excluded African Americans. Petitioner's failure to make any such showing renders his claim baseless.

For the foregoing reasons, the denial of Petitioner's PCRA petition should be affirmed.

By the Court:

Date: January 17, 2017

_____ J.

5